Whitaker, Judge,
delivered the opinion of the court:
On September 4, 1953, plaintiff was awarded a contract for the manufacture of 165,000 pairs of khaki Army trousers. The contract was performed by plaintiff’s subcontractor, Keystone Coat & Apron Mfg. Corp., which is hereinafter referred to as Keystone. This suit arises out of plaintiff’s claim for increased costs resulting from packing difficulties and an assessment by defendant against plaintiff for the use of government furnished materials in excess of the contract allowances.
We shall consider first plaintiff’s claim arising out of the packing difficulties.
The specifications required that the trousers be packed in cartons, the dimensions of which were set out in the specifications, and that the cartons be placed in wire-bound wooden boxes, five to the box. The dimensions of the wire-bound boxes were also set out in the specifications. When Keystone began packing the first block of 8,000 trousers in December 1953, it was unable to fit five filled cartons into each wire-bound wooden box, as required by the specifications. After having been apprised of the packing difficulties, defendant’s representatives investigated the problem and orally authorized plaintiff, later confirmed by telegram of December 17, 1953, to pack only four cartons in each wire-bound *562 box. Thereupon, packing proceeded and the first shipment of 6,400 pairs of trousers was made on December 17,1953.
The packing requirements were further modified by a letter dated January 5, 1954, to plaintiff which specified a different size of carton.
On May 8,1957, after consideration of plaintiff’s claim for an adjustment because of the error in the specifications and the change in the size of the cartons, the contracting officer decided that plaintiff was entitled to $1,299.77 as an equitable adjustment. This total was made up of $907.50, the cost of 825 additional wire-bound wooden boxes, and $23.98 transportation charges; $187.45, increased cost of the substitute cartons; and $180.84 as the labor cost of packing the additional containers. Plaintiff’s claim for overhead was denied as inadequately established, and its claim for damages flowing from the defect w,as denied as not attributable to the change in specifications.
On May 13,1957, plaintiff appealed to the Armed Services Board of Contract Appeals. The Board affirmed the contracting officer, but also found that plaintiff was entitled to 4 percent of the $180.84 packing and labor cost, amounting to $7.23, as ,an allowance for payroll taxes and fringe benefits. The Board then added what it called a general and administrative allowance, computed by applying plaintiff’s experience of 6.89 percent of “sales” as plaintiff’s general and administrative expenses, amounting to $90.05, making total costs of $1,391.05. To this the Board added a 4.02 percent profit allowance of $56.16, making the total amount of the adjustment for the change of $1,453.21, which was paid to the plaintiff pursuant to the Board’s findings.
The temporary inability to pack trousers caused a backlog of four days’ production (12,060 pairs) to accumulate in Keystone’s packing department. The Trial Commissioner found that the Board of Contract Appeals had overlooked an item of $252, the wages of nine additional persons required to catch up on the backlog. Defendant does not dispute this allowance. The Trial Commissioner also found that plaintiff was entitled to an overhead allowance of 53 percent of direct labor plus an allowance of 4.02 percent of labor and overhead for profit, making a total of $500.70. No deduction *563 from tbe total was made for the overhead and profit allowance made by the Board.
We think that the Trial Commissioner was in error in allowing 53 percent of direct labor for overhead, .amounting to $229.35. The Board allowed $97.28, and plaintiff was paid this amount. There is no evidence that the Board acted imf airly or arbitrarily in its determination.
However, plaintiff is entitled to an allowance for overhead on the $252 increased labor cost due to the defect in specifications. At the rate found by the Board for payroll charges and general and administrative expenses, which we think was reasonable, plaintiff is entitled to $10.08 to be added to the $252 for payroll charges, and $18.06 for general and administrative expenses, making a total of $280.14. Plaintiff is not entitled to any allowance for profit. Defendant’s failure to furnish adequate packing specifications was a breach of contract; plaintiff is not entitled to profit on the amount of the damage resulting therefrom. Torres v. United States, 126 Ct.’ Cl. 76, 79.
We now turn to plaintiff’s claim for refund of amounts assessed against it for excess usage of government furnished materials, which is the basis of defendant’s counterclaim.
In March 1954, $2,848.80 was deducted from the final invoice submitted by plaintiff to cover usage of cloth and buttons furnished by the defendant in excess of the contract allowances. By December 1954, defendant had allowed plaintiff further credits on account of material returned, resulting in a deduction of $683.27 instead of $2,448.80. However, defendant discovered an error in its computation and found that the correct balance for excess materials used was $759.98, and, therefore, there was due from plaintiff $76.71, which had not been withheld. On May 3, 1955, the Philadelphia Quartermaster Depot wrote plaintiff in pertinent part as follows:
The Contracting Officer has determined your company be held pecuniarily liable to the Government in the amount of $759.98 to cover the value of Government Furnished Property used in excess of authorized allowances, * * *.
*564 Since tbe sum of $683.27 has been withheld in partial satisfaction from payments due under subject contract, request check for the balance of $76.71 made payable to the Treasurer of the United States, be furnished this agency for proper adjustment of your account.
In reply to the Depot’s letter, plaintiff wrote on June 10,1955, requesting a check for $683.27, the sum which defendant had withheld, claiming that it had not used this much material. However, by letter dated June 23, 1955, the contracting officer notified plaintiff as follows:
Reference is made to your letter dated 10 June 1955.
A review of the records of this office indicates that you previously raised the question of clarification of allowances in your letter of 4 August 1954.
In letter dated 17 August 1954, the allowances for Cloth, Cotton, Uniform Twill, and 22 line buttons were outlined for you based on 165,000 units. It is to be noted that allowances as indicated in letter of 3 May 1955 are based on 165,147 units accepted for payment. In this connection, you were notified 3 May 1955 of the excess usage valued at $759.98.
Since the sum of $683.27 was withheld from payments due under subject contract, it is requested that you remit your certified check or money order for the balance due of $76.71 made payable to the Treasurer of the United States.
Thereafter, and until December 3, 1957, no further action was taken with respect to the matter by either party. However, on December 3, 1957, plaintiff’s attorney wrote the successor contracting officer requesting a determination of the plaintiff’s rights. On December 9, 1957, the successor contracting officer replied by letter stating that plaintiff’s failure to appeal from the contracting officer’s determination of June 23, 1955, made that determination final after the 30-day period for appeal had expired. The following day, December 10,1957, plaintiff filed an appeal with the Armed Services Board of Contract Appeals from the decision of the contracting officer as set forth in his letter of December 9, 1957. But the Board dismissed the appeal on the ground that the contracting officer’s letter of June 23, 1955, was a final determination from which plaintiff had failed to appeal within the 30 days allowed by the contract.
*565 The evidence at the trial of this case disclosed that after all adjustments for cloth and buttons used in the performance of the contract, and for cloth and buttons returned, there was a net saving to defendant of $85.17 over the amount withheld. However, plaintiff cannot claim payment for the saving, but only for the $683.27 which defendant withheld from plaintiff. Defendant does not contest the fact that there were net savings to it of $85.17, and that plaintiff would be entitled to the $683.27 withheld, if it had appealed from what it claims was a decision of the contracting officer on June 23,1955.
We do not think the letter of June 23, 1955, was sufficient under the contract and under Army regulations to amount to a final decision, including findings of fact and notice, under the disputes clause. Keystone Coat & Apron Mfg. Corp. v. United States, 150 Ct. Cl. 277.[1]
Army Procurement Procedure, § 596.103-12(b) (3) (i),[2] promulgated September 9, 1954, required the contracting officer to furnish the contractor with findings of fact and include in his decision a paragraph advising the contractor of his right to appeal. The letter of June 23, 1955, did not comply with the regulations and, hence, cannot be treated as a final decision of the contracting officer. Poloron Products, Inc. v. United States, 126 Ct. Cl. 816, was decided before the promulgation of these regulations.
Plaintiff is entitled to judgment for $280.14 as damages for the error in packing specifications and $683.27, the amount *566 which tbe defendant erroneously withheld, or a total of $963.41. Judgment for this amount will be entered.
Defendant’s counterclaim will be dismissed.
It is so ordered.
Dukfee, Judge; Laramore, Judge; MaddeN, Judge, and JoNes, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Saul B. Gamer, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is, and at all times material hereto has been, a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal place of business located in Philadelphia, Pennsylvania.
2. On September 4, 1953, plaintiff was awarded a contract (No. DA 30-352-TAP-2604) by the Armed Services Textile and Apparel Procurement Agency for the manufacture by plaintiff of 165,000 pairs of men’s khaki cotton uniform twill trousers, in 11 sizes, at a unit price of $1.24 and a total price of $204,600. The contract was to be performed in full by plaintiff’s subcontractor, the Keystone Coat and Apron Mfg. Corporation of Philadelphia, Pennsylvania (hereinafter referred to as Keystone), which was designated in the contract under the heading “Location of plant, inspection and shipping point.” The principal stockholder of plaintiff was also the principal stockholder of Keystone. There was no written subcontract between the two corporations.
3. The contract provided in pertinent part, as follows:
GENERAL PROVISIONS
(Supply Contract)
* * * * *
2. Changes
The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes, within the general scope of this contract, in any one or more of the following: (i) drawings, designs, or specifi *567 cations, where the supplies to be furnished are to be specially manufactured for the Government in accordance therewith; (ii) method of shipment or packing; and (iii) place of delivery. If any such change causes an increase or decrease in the cost of, or the time required for, performance of this contract, an equitable adjustment shall be made in the contract price or delivery schedule, or both, and the contract shall be modified in writing accordingly. Any claim by the Contractor for adjustment under this clause must be asserted within 30 days from the date of receipt by the Contractor of the notification of change: Provided, however, That the Contracting Officer, if he decides that the facts justify such action, may receive and act upon any such claim asserted at any time prior to final payment under this contract. Failure to agree to any adjustment shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled “Disputes.” However, nothing in this clause shall excuse the Contractor from proceeding with the contract as changed.
# $ ‡ $
12. Disputes
Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Secretary, and the decision of the Secretary or his duly authorized representative for the hearing of such appeals shall be final and conclusive: Provided, That if no such appeal is taken, the decision of the Contracting Officer shall be final and conclusive. In connection with any appeal proceeding under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer’s decision.
*568 GOVERNMENT FURNISHED PROPERTY PROVISIONS
GOVERNMENT FURNISHED PROPERTY.-CLOTH ONLY
(a) Allowances. — The Government may fumisli not more than 5% of the Material in short pieces. The Government may substitute material for that listed and may vary the allowances set forth and substitution or variation shall be deemed a change and appropriate adjustment of the terms of this contract shall be made under the section of this contract entitled “Changes.” If the Government so elects, the cloth furnished may be charged to contractor’s account in units of one yard; where a fraction is less than one-half yard it will not be recorded; where it is one-half yard or more it may be recorded and charged as a full yard. Unless otherwise specified stated unit allowances are gross with no reduction for imperfections. If material in widths other than those stated herein is furnished, the applicable unit allowances will be furnished at the time delivery of such material is made. Contractor shall retain all. piece tickets supplied with materials furnished under this contract for a period of 90 days after completion of the contract.
(b) Additional Property — Credit for Property Returned. — Contractor will be charged for all property furnished by the Government in excess of the applicable unit allowances. No charge will be made unless the total of all property furnished in excess of unit allowances exceeds $25.00. In determining whether contractor exceeded the unit allowances, credit will be given for all property returned undamaged in the form of full pieces, short pieces and ends, but no credit will be given for property returned in the form of remnants, cut parts, clippings, damaged pieces or irreparable garments.
* $ * $ $
VALUATION OF GOVERNMENT FURNISHED PROPERTY
Government Furnished Property will be valued, in cases of contractor’s liability, at the price shown below for the basic width indicated, except m cases where the current market prices are applicable. The basic width shown is furnished for this purpose only and is in no way to be construed as limiting the Government’s right to furnish any other width of said material. The material furnished in widths other than the basic width will be valued at prices representing appropriate conversions of the basic width price.
*569 NOiMENCLATURE OF GOVERNMENT FURNISHED PROPERTY
WIDTH PRICE
Cloth, Cotton, Uniform Twill, 8.2 Oz., 39" $0.64 Khaki #39 Type 6, Preshrunk.
Cloth, Cotton, Twill, 6.25 Oz. Preshrunk_ 44" $0.83
Button, Sewing, Composition, Phenol Por- _ $ .0010 ea. maldehyde, Khaki, Style 4, Line 22, 4 hole.
Button, Sewing, Composition, Phenol For- _ $ .0015 ea. maldehyde, Khaki, Style 4, Line 27, 4 hole.
In the event of loss or damage of the Government Furnished Property, the contractor will be liable for the material at the above quoted-price, [sic]
In the event of usage of Government Furnished Property, in excess of Government allowances or in excess of the percentage of standard Government allowances which the contractory [sic] says will be necessary, the contractor will be liable for the excess material at the above quoted price whichever is the higher.
^ Hi ^
PACKAGING AND PACKING REQUIREMENTS
Only identical items and quantities will be packaged in each unit, intermediate and/or shipping container.
item: Trousers, Cotton, Khaki pack: 5 Trousers (Pack through 24" x 16" face) unit pack: Fold legs toward waistband to give a length of approximately 24". Reverse nest five pair of trousers and tie with string. Place two bundles (10 pair trousers) in polyethylene bag .003 gauge flat, size 21" x 31" heat seal closure. Over pack in LLL-B-631C B.SO 200# test. Tape seal carton Spec. ÜU-T-111B carton size 24" x 16" x 4" O.D.
domestic: Place five unit cartons (50 pair trousers) in wire bound box complying with Spec. NN-B-631B Style 2 box size 24" x 20" x 16" I.D.
export : Place five unit cartons (50 pair trousers) in wire bound box complying with Spec. MIL-B-107A Style 2 box size 24" x 20" x 16" I.D.
4. The delivery schedule originally provided for in the contract was as follows:
55.800 Pair by 31 October 1953
54,900 Pair additional by 30 November 1953
54.800 Pair additional by 31 December 1953
However, because of the late delivery of Government-furnished material to plaintiff, the schedule was, by a change order, changed to read as follows:
*570 55,300 pr. by 28 Dec. 1953
54,900 pr. additional by 28 Jan. 1954
54,800 pr. additional by 28 Feb. 1954
CLAIM POR EXCESS PACKING COSTS
5. At the time the contract herein involved was performed, Keystone occupied the first, sixth, and eighth floors, and the basement, of an 11-story factory loft building in Philadelphia. The packing for this contract was performed in the basement. During the same period, a contract for the manufacture of Navy white trousers was also being performed by Keystone, and these trousers were likewise being packed in the basement at the same time as the packing operations were being performed on the khaki trouser contract. However, the packing operations on the Navy white trouser contract were set up in an entirely separate part of the basement.
6. Keystone planned to commence its production on the instant contract with approximately 2,000 pairs of trousers per day. It then planned to increase the production shortly to approximately 2,500 per day and then to further increase it to approximately 3,000 per day. Its manufacturing operations commenced on November 24,1953, and by November 30,1953, it had completed the last of the manufacturing and sewing operations on 2,190 trousers. Thereafter, a certain number of trousers were similarly completed daily on each workday. Almost immediately after November 30, production increased to approximately 2,500 daily for about a week, and thereafter generally increased for the balance of the month of December to between 2,500 and 3,000 per day. On 3 days during this period, over 3,000 pairs were produced. Between November 30,1953 and December 31,1953, Keystone produced 61,280 pairs of trousers in 24 workdays, thus averaging approximately 2,550 pairs per workday.
7. Keystone’s basement packing operations were set up to be balanced with its production operations. Its basement packing crew, normally consisting of nine employees, exclusive of supervisors, could handle production up to approximately 3,000 trousers per day. Additional packing employees would be necessary when production exceeded that figure for any sustained period of time as Keystone utilized *571 all available space and only allotted to the packing department the minimum amount required to keep pace with its planned production. Excess amounts of trousers in the basement would create a space problem and interfere with the efficiency of the overall operation.
8. Keystone established an assembly line procedure for its packing department, to be operated by nine employees as follows:
The operations commenced with the folding of the trousers to a length of approximately 24 inches and then tying, with strings, five trousers into a bundle. Two employees were engaged in this folding and tying operation. The bundles were then placed in bins by sizes to await Government inspection. Inspection was planned to be made hi lots of approximately 8,000 trousers, referred to as a “block.” After a block passed inspection, the' trousers were then taken out of the bins and placed in polyethylene bags. Two employees were engaged in this operation. Two five-trouser bundles were placed in each bag. The bags were then sent down a chute to be heat sealed. Two employees handled the heat sealing operation, operating two heat sealing machines. After heat sealing, the bags were then put into fiberboard cartons with outside dimensions of 24 by 16 by 4 inches, and the cartons then closed, sealed and stenciled. One employee handled this operation. Each carton held one bag of 10 trousers. Five such cartons were then to be placed into a large wire-bound wooden box with inside dimensions of 24 by 16 by 20 inches, being exactly five times the exterior dimensions of the cartons. The wooden 'boxes were then closed, stenciled and weighed, and then transported to the shipping department on the first floor. Two employees handled these phases of the operation. As necessary, the employees would sometimes shift to and help out on other of the packing operations than those to which they were normally assigned.
9. The average daily wage of the nine employees engaged in the packing operations was $7. Thus, exclusive of supervision, plaintiff’s normal labor cost for packing as high as 3,000 pairs a day was an average of $63 per day.
10. The first block of 8,000 trousers inspected under the contract was accepted on Thursday, December 10, 1953. *572 When Keystone began packing these trousers, it discovered that five fiberboard cartons would not fit into the wooden wire-bound box. The trouble was caused by bulges in the fiberboard cartons caused by the polyethylene bags filled with the 10 pairs of trousers. The sides of the cartons bulged to such an extent that five of them would not fit into one wooden box. Experimentation with different methods of packing the wooden box by Keystone and its carton supplier was unsuccessful. Finally, on Tuesday, December 15, 1953, Keystone concluded that the specifications with respect to packing were erroneous and on that day contacted defendant’s representatives. Taking exceedingly quick action to meet the problem, representatives of the defendant came to Keystone’s plant on the same day to investigate the difficulty. They too were unable to pack the large outside wooden box with five cartons in accordance with the specifications. In the late afternoon of that same day or the early morning of the following day, Wednesday, December 16, 1953, duly authorized officials of the defendant confirmed defendant’s error in the specifications and gave Keystone oral permission to pack, on sizes up to and including 36, only four cartons in each wooden box. Thereupon, on Wednesday, December 16, packing proceeded and the first shipment of 6,400 pairs of trousers was made on December 17. In the meantime, the production of Thursday, December 10, Friday, December 11, Monday, December 14, and Tuesday, December 15, in the amounts of 2,850, 3,240, 2,550 and 3,420 pairs, respectively, totaling 12,060 pairs for the 4 days, had piled up in the part of the basement allocated to the packing operations on this contract, which pileup to such extent, but for defendant’s error, would not have occurred.
11. There was a large accumulation of unpacked trousers by December 15 and Keystone added employees to the packing line to eliminate the backlog. As stated, the accumulation was caused in part by the inability to pack the trousers flowing into the packing department from December 10 to December 15.
The accelerated packing production after December 15, 1953, and through the week ending January 2,1954, was accomplished through the transfer of employees from other *573 departments, including the Navy trouser operations, the hiring of two new employees during the weeks ending December 26,1953, and January 2,1954, and the performance of some overtime. During such period, 16 employees were engaged in packing operations on this contract instead of the normal packing line of nine.
12. Keystone’s production and delivery schedule for the period November 30,1958 through December 31,1953, as well as the amounts accepted by defendant and the number of pairs of trousers on hand in the packing department, was as follows:
pro- ac-DTJCED CEPTED ON SHIPPED HAND
Monday-November 30_ 2, 190 _ _ 2, 190
Tuesday-December 1_ 2,400 _ _ 4,590
Wednesday-December 2_ Thursday-December 3_ 2,550 _ 2,550_ _ 7, 140 _ 9, 690
Friday-December 4_ 2,640 _ _ 12,330
Saturday-Deeember 5_ 1,440 _ _ 13, 770
Monday-December 7_ 2,550 _ _ 16,320
Tuesday-December 8_ 2, 780 _ _ 19, 100
Wednesday-December 9_ 3,360 _ _ 22,460
Thursday-December 10— 2, 850 8, 000 _ 25,310
Friday-Deeember XI_ 3, 240 _ _ 28,550
Monday-December 14_ 2, 550 _ _ 31, 100
Tuesday-December 15_ _ 3,420 _ _ _ 34,520
Wednesday-December 16 2, 480 15, 000 _ 37,000
Thursday-December 17_ 3,030 _ 6, 400 33, 630
Friday-December 18_ 2,915 _ 6, 400 30, 145
Monday-December 21_ 2,400 _ 6, 400 26, 145
Tuesday-December 22„ , 2, 790 _ _ 28, 935
Wednesday-December 23 2, 940 12, 800 6, 400 25, 475
Thursday-December 24— 270 _ _ 25, 745
Monday-December 28_ 2,730 _ 6, 400 22, 075
Tuesday-December 29_ 1, 980 5, 000 _ 24,055
Wednesday-December 30 2,340 _ _ 26, 395
Thursday-December 31-2,885 _ 8, 800 20, 480
61, 280 40, 800 40, 800
13. In the weeks ending December 19, 1953, December 26, 1953, and J anuary 2, 1954, plaintiff expended in labor in its packing department on this contract in connection with packing the 40,800 pairs of trousers shipped during such period, as set forth in finding 12, the total amount of $2,132.19. Plaintiff contends that at an average daily production and packing rate of approximately 2,600 pairs, as set forth in finding 6, said 40,800 pairs could have been shipped with a normal nine-employee line in 15.7 days (40,800-^2,600), and that, at the average daily rate of $63 *574 per day, it would have cost plaintiff only $989.10 (15.7 X $63) to ship said 40,800 pairs. Inasmuch as it actually cost $2,132.19 to ship them, plaintiff claims the difference of $1,143.09 as its excess packing labor costs due to defendant’s error. This amount, plus 53 percent thereon, or $605.84, claimed as increased overhead due to the increased labor costs, said percentage being Keystone’s experienced ratio of overhead to direct labor costs, brings plaintiff’s total claim to $1,748.93. Thus, plaintiff attributes its entire expenditure during the period in question over what the “normal” expenditure would have been to the specification error.
Plaintiff’s contention cannot be sustained for the following reasons: It was normal to have some backlog in the packing-department. A normal backlog consisted of approximately 10,500 trousers, being composed of a block of 8,000 awaiting inspection, as set forth in finding 8, plus one day’s production of approximately 2,500. The day’s production would come to the basement from the factory and would be pressed in the basement and packing operations then commenced. Such production would, after pressing, be tied and put into the inspection bins, thus commencing a new inspection block. However, at the time the packing difficulty was first encountered on December 10, 1953, Keystone already had on hand an abnormal backlog of 22,460 pairs as of the close of business on December 9,1953, as shown by finding 12. There is no showing that any part of this abnormal backlog on hand at that time was in any way attributable to defendant. By the time the specification error was discovered and corrected so that packing could commence on December 16, the backlog had grown to 34,520 pairs as of the close of business on December 15. However, as shown by finding 10, the only part of this backlog attributable to defendant was with respect to the 4 days’ production from Thursday, December 10, to Tuesday, December 15, in the amount of 12,060 pairs, when packing ceased due to defendant’s error. Accordingly, the extra expense caused by defendant’s error was that amount which was necessary to clear an extra 4 days’ production of approximately 3,000 per day.
As set forth in finding 9, a normal packing crew of nine employees at an average of $63 per day could pack 3,000 pairs *575 a clay under Keystone’s normal routine. Thus, an extra crew at the same rate could pack an additional 3,000 pairs. The increased backlog of approximately 12,000 pairs attributable to defendant could thus be dissipated oyer a 4-day period by an additional nine-man crew. Accordingly, the proportionate part of the extra costs of the additional seven employees Keystone assigned to the packing line which is fairly attributable to defendant is the equivalent of nine employees working four full days. Such cost would be $63 per day, which would result in a total excess packing labor cost of $252 ($63X4) attributable to defendant. Any additional amounts spent for packing labor during the period in question must necessarily have been attributable to factors other than the specification error, which held up the packing operations for only four working days.
In addition to the excess packing labor costs of $252.00 attributable to defendant’s error, Keystone also incurred some overhead expenses because of the error. Since there was no expansion of the time of performance of the contract, the majority of the overhead items were not affected. However, additional payroll expense of payroll taxes and fringe benefits were incurred. These amounted to about 4 percent of wages. Keystone also incurred general and administrative expenses in connection with the packing difficulty. An estimate of this amount can be made through utilization of its general and administrative expense ratio of 6.89 percent of “sales.” Thus, Keystone’s overhead costs were increased by $28.14. Accordingly, plaintiff’s total excess costs attributable to defendant were $280.14.
14. The oral authorization to pack the wooden boxes with four instead of five cartons, as set forth in finding 10, was confirmed by a telegram dated December 17, 1953, from the contracting officer to the plaintiff, and by letter of January 5,1954, the contracting officer gave the following further instructions to plaintiff:
Reference is made to the above contract for the manufacture of Trousers, Men’s Cotton Uniform Twill, Khaki Shade 1.
Rescinding telegram from the office dated 17 December 1953, you are advised as follows:
*576 a. Permission is granted to use intermediate fibre-board container size 24"xl6"x5" OD in lieu of 24"x 16"x4" OD. The minus tolerance of 1/16" in container dimensions will be acceptable.
b. Permission is granted to overpack 4 intermediate containers of 10 trousers each (40 trousers) in lieu of 5 intermediate containers (50 trousers).
c. Permission is granted to ship sizes up to and including size 36 in the 4" depth dimension containers you have on hand. In addition, you are hereby authorized to employ the 4%" depth dimension containers, procured upon recommendation of this office, until such time as the on-hand supply of these containers is exhausted and have obtained the new container specified in Paragraph a above.
As a result of the changes in the packing requirements specified in this letter, plaintiff was obliged to purchase 825 additional wooden boxes, at a cost of $907.50, to expend $23.98 in transporting them to the Keystone plant, to purchase cartons of a different size than originally specified, at an increased cost of $187.45, and to expend $180.84 as extra labor costs in packing the 825 additional wooden boxes, totaling $1,299.77 for said four items.
15. By letter of February 17, 1954, to the contracting officer, plaintiff made claim for (1) “the cost of packing labor in the period December 10,1953 to December 31,1953, which was in excess of the normal packing labor which had been planned for this contract,” (2) increased costs in performing the Navy trouser contract resulting from the displacement of space required for such contract “by reason of the disruption caused by the packing problem under” the khaki trouser contract, and (3) “the cost of the larger packing units and the additional labor attendant upon the use of the larger units.” The letter stated that “detailed schedules of the foregoing items will be furnished.” Supporting data was subsequently furnished on January 19, 1956, September 6, 1956, and March 21, 1957, with the claim for the four items specified in finding 14 being in said total amount of $1,299.77. Claim for the loss on the Navy white trousers was made on January 19,1956, in the amount of $3,959.70, but this claim was withdrawn on March 21, 1957. The claim for the “packing labor increase covering the weeks ending December *577 12,1953 to January 2,1954” came to $2,806.42, plus overhead of 78.19 percent thereon. Overhead was similarly claimed on the $180.84 increased labor expended for packing the additional 825 wooden boxes. On May 8,1957, the contracting officer made formal findings of fact and decided that plaintiff was entitled to an equitable adjustment in the amount of $1,299.77, covering the four items of claim hereinabove mentioned. The other items of the claim were rejected with the following findings:
5. The contractor has failed to sustain its burden of proof with reference to the amount of overhead applicable to the labor expended in packing 825 additional exterior containers and, consequently, no allowances can be made therefor.
6. The additional costs, if any, resulting from an increase in the labor force and overtime work in contractor’s packing department during the weeks ending 14 December 1953 through 2 January 1953 [sic] is not attributable to the change in packing specification and the contractor’s claim therefore' is disallowed.
16. On May 13,1957, plaintiff filed a timely appeal to the Armed Services Board of Contract Appeals (hereinafter called the “Board”). On the appeal, the excess packing labor cost claim was reduced first to $2,582.71, and then reduced again to $1,905.48. The claimed overhead rate was reduced during the proceedings before the Board from 78.19 percent to 53 percent. After a hearing at which witnesses were heard and exhibits were submitted on behalf of both sides, the Board, on January 28,1958, affirmed the contracting officer’s decision rejecting in its entirety the “excess packing labor cost” claim, stating:
Excess packing labor cost. — After a careful examination of the evidence we 'are not convinced that the defect in packing specifications and the change order resulting therefrom caused any substantial increase in packing labor costs on the first 40,800 pairs of trousers, other than the packing costs on the additional exterior containers which were allowed by the contracting officer. The claim for excess packing labor cost is denied.
However, on plaintiff’s claims for overhead, both on the $180.84 labor claim allowed, and on the $1,905.48 claim rejected, which, at the claimed overhead rate of 53 percent of *578 the labor costs involved, totaled $95.85 and $1,177.76, respectively, the Board held:
Overhead allowance. Both the Government and appellant appear to take the position that whether appellant is entitled to an overhead allowance on allowable packing labor cost depends on whether or not packing labor is classed as direct labor. As we see it, whether packing labor is to be treated as direct labor or as overhead is not a question of either one or the other. There is no accounting inconsistency in treating packing labor as indirect or nonmanufacturing labor and at the same time charging it directly to a particular product, job or contract. The mere fact that a cost is not treated as a direct manufacturing cost does not mean that it must be apportioned pro rata on a direct labor basis to the contractor’s entire operations, nor does it mean that no indirect costs can be allocated to it.
* * * *
Under the “changes” clause appellant is entitled to a price adjustment based on the increased costs of performance resulting from the change order; and this includes, not only the increase in labor and material costs, but also any increase in indirect costs resulting from the change order. In determining the amount of the increase in indirect costs, the Board would be inclined to follow the contractor’s own method of computing costs, if the contractor consistently followed any accepted cost accounting method. The method proposed by appellant does not conform to generally accepted accounting principles and practices, and there is no evidence that it is a method consistently followed by appellant. Nevertheless, appellant is entitled to a price adjustment which equitably and realistically reflects the increased indirect costs of performance resulting from the change order. The cost data available to the Board is insufficient to permit precise determination, but for the relatively small amount involved it is considered sufficient for the making of an “equitable adjustment.”
It appears that appellant’s payroll taxes and fringe benefits which ordinarily vary in proportion to wages were about 4% of wages. As an allowance for this factor, 4% should be added to the $180.84 packing labor cost allowed by the contracting officer. This is $7.23 to be added to the $1299.77 allowed by the contracting of-ficei’, making a total of $1307.00. Undoubtedly the contractor incurred general and administrative expenses in connection with the change order, and it is equitable *579 that there be added a general and administrative allowance computed by applying the contractor’s experienced general and administrative expenses of 6.89% of “sales” to the $1307.00 making the general and administrative allowance $90.05 and the total $1397.05. To this should be added a 4.02% profit allowance ($56.16) making the total amount of the price adjustment for the change order $1453.21.
The Board finds that the amount of the price adjustment should be increased from $1299.77 to $1453.21.
Said amount of $1,453.21 allowed by the Board was, after the petition herein was filed, paid to plaintiff.
17. (a) On July 5, 1958, plaintiff filed its petition herein, claiming the sum of $1,905.48 as “excess packing labor from December 14, 1953 to January 2, 1954”, together with 53 percent thereon as overhead, and 53 percent of the $180.84 labor allowance made by the Board, or $95.85, also as general overhead. Plaintiff 'alleged in the petition that the failure of the Board to allow these items “was arbitrary, capricious and not supported by substantial evidence.” A.fter trial, plaintiff revised the excess packing labor claim to $1,143.09, the amount now claimed, as set forth in finding 13. The basis for plaintiff’s 53 percent overhead computation is also set forth in finding 13.
In addition, in its petition plaintiff again asserted the claim for damages for hindrance to the performance of the Navy white trouser contract, which claim, as set forth in finding 15, had also been asserted in the administrative proceedings but withdrawn during the course thereof. This claim was reduced in the petition to the amount of $3,399.94. However, at the trial, and in open court, plaintiff again withdrew said claim.
(b) Defendant contends that the action of the Board in wholly rejecting certain portions of plaintiff’s claim, and in limiting other portions, is final and conclusive and that no further allowances are justified. If the claim pertaining to the excess packing labor costs attributable to defendant as a result of the error in its specifications, which error was subsequently corrected by a change in the specifications, be considered as an item which would have been proper for inclusion in the change order (as the Board so considered it), the decision of the Board in failing to award *580 any amount whatsoever on account thereof was, in light of the evidence before it as well as the additional evidence introduced before this court, arbitrary and not supported by substantial evidence. Such evidence indisputably showed at least 4 days’ delay in Keystone’s packing operations due to defendant’s error. Similarly, plaintiff would be entitled to an overhead allowance on the $252.00 extra labor cost. This allowance should include 4 percent for payroll expenses ($10.08), and 6.89 percent for general and administrative expenses ($18.06). Accordingly, plaintiff should have been allowed an additional $280.14 ($252.00 labor, $28.14 overhead). The Board allowed overhead on the $180.84 labor expenditure for packing the additional 825 wooden boxes and no additional costs attributable to the change order have been established. Thus, the total amount to be added to plaintiff’s recovery under the change order is $280.14.
(c) Despite plaintiff’s having presented the excess packing labor claim and the general overhead claim based thereon to the Board for allowance in the change order, the Board’s assertion of its own jurisdiction thereof, and plaintiff’s allegations in the petition concerning the Board’s actions in denying said claims, plaintiff now contends that, under the contract, the Board had no jurisdiction over them. Plaintiff now contends that the Board had jurisdiction only of the items of claim which the Board did allow, consisting of “the cost of the additional exterior containers, the increased cost of the new intermediate containers, and the labor for packing the additional exterior containers.” It therefore contends that the rejected items of its claim, being the excess packing labor expense and the increased general overhead caused thereby, are in the nature of “damages resulting to plaintiff from erroneous packing specifications.” On this basis, plaintiff was damaged in the aforementioned sum of $280.14, constituting the $252.00 for increased packing labor, plus $28.14 as increased overhead caused thereby.
CLAIM RE USE BY PLAINTIFF OF MATERIALS IN EXCESS OF CON-
TRACT ALLOWANCES
18. Upon completion of deliveries under the contract and the submission by plaintiff of its final invoice, defendant *581 reviewed its records to ascertain whether plaintiff had made usage of Government-furnished material in excess of the allowances specified by the contract, and for which plaintiff should, therefore, be charged. A “Property Certification Form” to be filled in and returned by plaintiff, and which was required to determine the amounts accurately, had not as yet been received from plaintiff. However, a review in March 1954 of defendant’s records indicated excess usage in the amount of at least $2,848.80. Accordingly, said amount of $2,848.80 was, pending a final audit, deducted from the final invoice. By letter of April 13,1954, plaintiff requested an explanation of the deduction “inasmuch as our records do not show an excess usage of Government furnished property.” By letter of April 19, 1954, the contracting officer replied:
The accountable property records as of this date indicate the following excess usage of Government Furnished Property.
Cloth, Cotton, Uniform Twill 8.8 oz., Cloth, Cotton, Twill, Khaki §89, Type 6, Preshrunk 6.85 oz. Preshrunk Buttons 88L
Charged_ 345, 261 yards 91, 921 yards 1, 026, 300 ea.
Allowance_ 343,937 89,516 1,022,996
Excess_ 1, 324 2, 405 3, 304
Value of Ex-cess_$847.36 $1,996. 15 $5.29
In view of the excess usage as outlined above, your account is being charged the sum of $2,848.80.
19. By letter of April 29, 1954, plaintiff replied:
We are unable to reconcile the accountable property records for subject contract contained in your letter to us dated April 19,1954.
May we bring to your attention that we received against subject contract 320,302 yards of 4-2" khaki, whereas the figures used in your letter of April 19, 1954, apparently are based on the use of 39" khaki.
Moreover, we received a total of 97,762 yards of 41" drill.
We presently are holding a quantity of 2771 yards of drill for return to the Quartermaster upon receipt of the necessary shipping documents.
May we request that your letter of April 19, 1954 be reviewed in light of the information contained in this letter.
*582 However, by letter of June 14, 1954, the contracting officer stated:
if: * * * £
It is noted that material usage as indicated in the foregoing letter has not been converted to basic width. Basic width conversion of this usage would agree with usage reflected in Accountable Property Becords of this office. * * *
The letter went on to state that credit for the 2,771 yards would be given to plaintiff upon receipt by defendant of certain records.
By letter of July 12, 1954, plaintiff, still not having received the credit, again wrote making inquiry with respect thereto, and stating:
May we request therefore that action be taken to expedite our receipt of this credit so that this contract may be considered complete in regards to this outstanding item.
20. As a result of a further review of its records in July 1954, defendant concluded that plaintiff had used excess cloth of the value of only $847.36, plus excess buttons of the value of $5.29, and that, therefore, the difference between the total of such figures, i.e., $852.65, and the amount of $2,848.80 previously withheld could be released to plaintiff. However, after defendant informed plaintiff that such difference would be released, plaintiff, by letter of August 4, 1954, wrote as follows:
We have been informed that $847.36 is being withheld against subject contract for excess usage of cloth, cotton, khaki, 39" width.
However, our records indicate that 320,302 yards of 42" cloth, cotton, khaki were received against subject contract whereas according to the allowances on page 13 of Invitation to Bid 792 under which we were awarded subject contract, we should have received 324,628 yards of 42" cloth.
Consequently, we would appreciate your clarifying for us the basis on which the amount of $847.36 is being withheld.
Further, we note that a deduction in the amount of $5.29 is being withheld for excess usage of 22/khaki buttons. *583 Our records indicate that we received 7,078 gross of these buttons against subject contract whereas according to the allowances we should have received 7,194 gross of 22/buttons. Therefore, will you also be kind enough to explain why the deduction of $5.29 is being made.
In response, defendant, by letter of August 17, 1954, explained:
* * * * *
Review of Government records with figures submitted by you indicate the following discrepancies:
a. The allowance for Cloth, Cotton, Uniform Twill, 42", for contract quantity of 165,000 garments is 319,495 yards, whereas you have computed it to be 324,628 yards.
b. The contract allowance on 22 line buttons is 7,104 gross, whereas you have computed it to be 7,194 gross.
It is to be noted that the allowance computed above is based upon full contract quantity of 165,000 acceptable garments.
You are advised that $852.65 withheld is a tentative withholding and is subject to change pending the close of contract and final audit.
21. In December 1954, defendant, after the receipt from plaintiff of the Property Certification Form, referred to in finding 18, and after a further review of its records, concluded that the correct total value of the excess materials used by plaintiff was $683.27, and that, since defendant had previously withheld $852.65, the difference of $169.38 could be released. This amount of $169.38 was thereafter released to plaintiff. However, a subsequent review by defendant of its records indicated an error was made in a cloth unit cost figure used in computing the above-mentioned $683.27, and that the application of the correct unit cost figure would produce a correct total excess materials amount of $759.98. This computation would leave a balance due to defendant in the amount of $76.71. Accordingly, under date of May 3, 1955, the “Chief, Voucher Branch, Finance & Accounting Division” of the Philadelphia Quartermaster Depot, sent plaintiff the following letter:
The Contracting Officer has determined your company be held pecuniarily liable to the Government in the amount of $759.98 to cover the value of Government *584 Furnished Property used in excess of authorized allowances, computed as follows:

Nomenclature Cloth, Cln, Uniform, Twill 8.8 02., Khaki, 48" Button, Sewing Comp. Line 88

Contractor charged with. Allowance_ 320, 725 yds. 319, 629 ys yds. 1, 026, 300 ea. 1, 023, 908 ea.
Excess Usage_ 1, 095 % yds. 2, 392 ea.
Unit Cost_ $. 69 $. 0016
Value of Excess_ $756. 15 $3. 83
Total Excess_ _$759. 98
Since the sum of $683.27 has been withheld in partial satisfaction from payments due under subject contract, request check for the balance of $76.71 made payable to the Treasurer of the United States, be furnished this agency for proper adjustment of your account.
22. By letter of June 10, 1955, to the “Philadelphia Quartermaster Depot, U.S. Army”, plaintiff responded to the Depot’s letter set forth in finding 21, as follows:
*****
Our records indicate that the allowance on cloth, CTN, UNIF, TWL, KH, 42" was 323,608 yds. and on 22 ligne buttons, 1,036,068 each. Therefore no Government Furnished Property was used in excess of authorized allowances.
Please send your check for $683.27, the sum withheld from payments since August 1954.
However, by letter dated June 23,1955, the contracting officer wrote plaintiff as follows:
Reference is made to your letter dated 10 June 1955.
A review of the records of this office indicates that you previously raised the question of clarification of allowances in your letter of 4 August 1954.
In letter dated 17 August 1954, the allowances for Cloth, Cotton, Uniform Twill, and 22 line buttons were outlined for you based on 165,000 units. It is to be noted that allowances as indicated in letter of 3 May 1955 are based on 165,147 units accepted for payment. In this connection, you were notified 3 May 1955 of the excess usage valued at $759.98.
Since the sum of $683.27 was withheld from payments due under subject contract, it is requested that you remit your certified check or money order for the balance due of $76.71 made payable to the Treasurer of the United States.
*585 23. Thereafter, and until December 3, 1957, no further action was taken with respect to the matter by either party. However, by letter of December 3,1957, plaintiff, by its attorney, sent the following letter to the successor contracting officer:
Bostwick-Batterson Company has been charged $759.98 for alleged excess use of 1,095-% yds of cloth, cotton, uniform, twill, 8.2 oz., khaki, 42", and 2,392 buttons, sewing, comp, line 22.
By letter dated May 3, 1955 and letter dated June 10, 1955, which are incorporated herein by reference, you were informed that there is no basis for the charge and that Government furnished property was not used in excess of authorized allowance.
It is accordingly requested that the successor contracting officer determine the allowances, the amount of material furnished, the amount of material returned, and that no Government furnished material was used in excess of allowances, and upon doing so, direct the refunding of $759.98.
By letter dated December 9, 1957, the successor contracting officer replied as follows:
Reference is made to your letter dated 3 December 1957 requesting that the Contracting Officer examine the charge in the sum of $759.98 assessed for excessive Government materials used by Bostwick-Batterson Company under Contract DA 30-352-TAP-2604.
Please be advised that by letter to the contractor dated 23 June 1955, the Contracting Officer determined this question of excessive use of Government materials. In as much as the contractor did not file an appeal to that determination, it is considered that that determination is final and that no further examination may be made.
The following day, December 10, 1957, plaintiff filed an appeal with the Armed Services Board of Contract Appeals, from the decision of the contracting officer as set forth in his letter of December 9,1957.
24. On May 22, 1958, the Board dismissed plaintiff’s appeal, holding:
# $ $ & $
_ In this case there existed a continuing dispute, beginning in April 1954, over whether or not appellant had *586 used too much cloth and too many buttons. Each side presented figures to support its position, and the Government constantly adjusted its figures as to both the quantity and the unit price of the cloth. The figure finally rested at $759.98, with the appellant then flatly maintaining that there had been no excess usage. The letter of 23 June 1955, written in response to this last contention, adhered to the figure of $759.98 and made a request for payment. As far as the contracting officer is concerned, that letter seems to have been a final decision as to the amount to be charged, reached after consideration of the Government’s records, appellant’s claims, and the fault in appellant’s method of computing allowances. There was no protest from the appellant, and the fact of silence and inaction from 23 June 1955 to 3 December 1957 is one from which an inference may properly be drawn that the appellant, too, considered the decision to have been final. The request for determinations of the latter date seems to us no more than an attempt to revive an expired right of appeal.
While the successor contracting officer’s refusal to make findings of fact and decisions is in itself an ap-pealable decision, on the basis of all the facts we hold his refusal to be proper. There was a decision on the exact issue of the amount to be charged against the appellant for excess usage of Government-furnished property, and as no appeal was taken within the thirty days allowed by the contract, the decision is final and conclusive.
25. Plaintiff completed deliveries of 165,147 pairs of trousers under the contract and returned to defendant all full pieces, short pieces, and ends. In the performance of the contract, plaintiff consumed in excess of appropriate allowances 1,095-7/8 yards of 42 inches, 8.2-ounce cotton uniform twill cloth of a value of $0.69 per yard, amounting to $756.15; had saved under such allowances 1,097-2/8 yards of 41 inches, 6.25-ounce cotton twill cloth of a value of $0.77 per yard, amounting to $844.88; had consumed in excess of such allowances 2,392 line 22 buttons of a value of $0.0016 each, amounting to $3.83; and had saved under such allowances 151 line 27 buttons of a value of $0.0018 each, amounting to $0.27. These figures result in a total saving of $845.15 and a total excess usage of $759.98, or a net saving to defendant of $85.17.
*587 26. Defendant has retained the excess usage amount of $683.27, never having given plaintiff credit for the savings of $845.15, referred to in finding 25, and the excess usage balance of $76.71 demanded by the contracting officer’s letter dated June 23, 1955 (finding 22) has never been paid by plaintiff to defendant. Defendant has filed a counterclaim herein for said sum of $76.71, plus interest.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is entitled to recover, and it is therefore adjudged and ordered that it recover of and from the United States nine hundred sixty-three dollars and forty-one cents ($963.41).
It is further concluded that the defendant is not entitled to recover on its counterclaim, and the counterclaim is dismissed.

 The plaintiff in this case was the same company as plaintiff’s subcontractor in the present case. Defendant’s motion for summary judgment on the ground that a letter from the contracting officer demanding payment was a decision under the disputes clause of the contract from which plaintiff failed to appeal within the 30 days allowed by the contract was overruled, this court holding that under the contract and Naval regulations, the letter of the contracting officer was not a final decision.

 32 C.F.R., § 596.103-12 (b) (3) (i) (1954) reads in part:
“In rendering a decision on any dispute involving a question of fact, the Contracting Officer or the Head of a Procuring Activity, as the case may be, will prepare and sign findings of fact, a true copy of which with his written decision will be promptly furnished the Contractor. The Contracting Officer will include in his decision the following paragraph:
“ ‘If in your opinion the findings and decision hereinbefore set forth involve a dispute concerning a question of fact, you are hereby notified that in accordance with the provisions of Clause_, “Disputes” of the above numbered contract you may appeal from these findings and decision to the Secretary of the Army. * * *’ ”