## PHILADELPHIA REGENT BUILDERS

v.

## The UNITED STATES.

No. 360–79C.

United States Court of Claims.

Oct. 22, 1980.

Harry D. Shargel, Philadelphia, Pa., attorney of record, for plaintiff.

Lynn J. Bush, Alexandria, Va., with whom was Asst. Atty. Gen., Alice Daniel, Washington, D. C., for defendant.

Before NICHOLS, BENNETT and SMITH, Judges.

## ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

BENNETT, Judge.

This Government contract case is before us to review a decision in defendant's favor by the Veterans Administration Contract Appeals Board, VACAB No. 1179, 79–1 BCA ¶ 13,856 (1979). Both parties have moved for summary judgment. We have read and considered carefully the papers before us, and, without oral argument, grant defendant's motion, deny plaintiff's motion, and dismiss the petition.[1]

The essential facts as found by the VA-CAB and sustained by the record are that plaintiff, Philadelphia Regent Builders (PRB), a minority contractor, was given a subcontract on July 30, 1973, by the Small Business Administration (SBA), pursuant to section 8(a) of the Small Business Act, 15 U.S.C. § 637(a) (1976) (current version at 15 U.S.C. § 637(a)) (Supp. III 1979). The prime contract, No. V613C–48, dated June 20, 1972, was between the SBA and the Veterans Administration (VA) for roofing repair work at the Veterans Administration Center in Martinsburg, West Virginia. The subcontract provided for a price of $91,862 and a period of 90 days for performance. Plaintiff was to perform all the work. The SBA delegated to the VA the responsibility for administering the subcontract and PRB was to have the right of appeal from decisions of the contracting officer under the disputes clause of the subcontract. Appeals were to be taken to the VACAB. The contract between SBA and the VA also included the following special provision:

It is agreed that the provisions of the "Termination for Convenience", "Changes", "Disputes", "Default", and "Price Reduction" Clauses which are included in the contract between the SBA and its Contractor shall be invoked in appropriate cases when requested by the Procuring Contracting Officer (PCO). If the SBA does not agree with the Procuring Contractor Officer's (PCO) request, the case shall be referred to the Secretary[2] or his designee for decision.

Work was scheduled to begin October 1, 1973, and did begin sometime in October. PRB initially sub–subcontracted the entire project to Zeus Construction and Painting Company for $65,000. On the night of October 28–29, 1973, the area was struck by heavy thundershowers and winds. There was damage to the interior of the building due to leakage through the part of the roof being worked on. The VA determined that the contractor had not properly sealed the roof area and issued plaintiff a collection voucher for the damage in the amount of $26,509.

---

1. The date of the contracting officer's final decision, June 4, 1975, makes inapplicable the provisions of the Contract Disputes Act of 1978, 41 U.S.C. §§ 601 *et seq.* (Supp. II 1978). *Monroe M. Tapper & Assocs. v. United States*, 222 Ct.Cl. ——, 611 F.2d 354 (1979); *Troup Bros. v. United States*, Ct.Cl. No. 64–79 (order entered Aug. 24, 1979).

2. Should read "Administrator" instead of "Secretary."

On November 7, 1973, plaintiff terminated its sub–subcontract with Zeus and requested and received a 90–day extension of time. Plaintiff then engaged Edward Bannister, roofing contractor, to complete the work. Bannister took up the work but ceased after about 5 weeks and thereafter PRB performed the work with its own forces. The work progressed with successive extensions of time being allowed to December 7, 1974, upon PRB's requests based on delay due to inclement weather. Six progress payments were routinely approved. In September 1974 plaintiff was notified that since the collection voucher and a follow–up inquiry had been ignored, no additional progress payments would be made until the voucher had been paid.

Plaintiff's president, Mr. Killebrew, responded that he was attempting to resolve the collection voucher matter, but that he was unable to resume work on the project because of the refusal to make further progress payments, because the cost of materials had escalated 30 percent, and because delays had increased certain overhead costs by $14,500.

The situation was discussed by officials of the VA and SBA. The SBA urged that the withheld progress payment be made and, after consultation among VA officials, it was made. However, even after the progress payment was made, no substantial work was done on the project. On December 12, 1974, plaintiff requested $24,623 from SBA, to cover costs so that the contract could be completed, and a 90–day time extension. The extension was granted until March 7, 1975.

On December 16, 1974, Mr. Odom, the contracting officer, telephoned Mr. Monteleone, the SBA representative involved in the contract, to discuss the situation. Mr. Odom complained that plaintiff was not making any progress. Mr. Monteleone indicated that SBA had no funds with which to assist PRB. The two men discussed the alternatives, including a termination for default. Mr. Monteleone agreed that default termination would be the next course of action although he was reluctant to see that

happen. He promised to contact plaintiff to see if something could be worked out. Later that day, Mr. Monteleone called Mr. Odom back. He asked if the contract could be terminated for convenience rather than default. Mr. Odom replied that it could not be done because there was no convenience to the Government. Mr. Monteleone then remarked that the bonding company could finish the job when the contractor defaulted. Mr. Odom agreed. Shortly afterwards, VA concluded that it could not supply PRB with any additional funds.

On January 21, 1975, Mr. Odom urged plaintiff to resume work, since no recent work had been done and there was leakage in uncompleted areas. Plaintiff requested a 90–day extension of time from March 7, 1975, citing weather conditions, unavailability of materials at quoted prices, and negotiations for a contract price increase as relevant factors. A 30–day extension was granted, and the contractor was notified that further extensions would be considered if work was resumed or evidence was otherwise given that the contract would be completed. The time was later further extended 15 days, and then another 21 days (to May 12, 1975) on the basis of information that the contractor's surety would bring in another contractor to complete the project. The notice of this final extension stated it was imperative that further physical progress be made before more extensions would be considered and that the contractor would be declared in default in the absence of evidence of intent to proceed.

No work was performed, no evidence of intent to proceed was received, and no extension of time from May 12, 1975, was requested or granted. A final decision terminating the contract for default was issued on June 4, 1975.

 Our review of the board's decision is governed by the standards of the Wunderlich Act, 41 U.S.C. §§ 321, 322 (1976). All findings of fact by the board must be upheld unless they are fraudulent, arbitrary, capricious or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence. *Koppers*

*Co. v. United States*, 186 Ct.Cl. 142, 147, 405 F.2d 554, 557 (1968). Furthermore, our rules require that a party seeking to overturn administrative findings of fact must specifically enumerate such findings separately and in numbered paragraphs, and must give reasons why the administrative finding is not entitled to finality along with supporting citations to pertinent parts of the administrative record. Ct.Cl. Rule 163. Plaintiff record. Plaintiff has not complied with our rules but in any case appears to attack only three findings of fact by the board. These are totally insignificant and immaterial for the purposes of the instant motions.[3] Therefore, all the facts found by the board that are included in the text of this opinion have not been excepted to by plaintiff and are taken as true.

Plaintiff's attacks on the default termination and the board decision upholding it can be boiled down to four main points: (1) the delays causing the default were excusable; (2) there were formal defects in the notice of termination; (3) the contracting officer had no authority to terminate the contract for default; (4) the board lacked jurisdiction over plaintiff's appeal.

■ Plaintiff's first argument is that the contract should not have been terminated for default because its delays in performance were excusable. Plaintiff offers as excusable causes of delay: (1) poor weather and acts of God; (2) faulty Government specifications; (3) interference by the VA in the form of restrictions on working hours and conditions; (4) anticipatory breach by the Government. However, the board decision reflects other factors involved: increase in overhead and materials costs and plaintiff's lack of necessary financing. Thus, we have a question as to what in fact was the cause of plaintiff's inability to complete the contract. The board found that (1) plaintiff's assertions of excusable delay were not supported by the evidence; (2) the VA restrictions were reasonable; (3) the

one delayed progress payment had no substantial impact on plaintiff's inability to perform; (4) the VA was not responsible for the delay in the work or the financial difficulties which prevented plaintiff from completing the work. These are findings of fact not excepted to by plaintiff. Furthermore, we find them to be supported by substantial evidence in the record. We would further note that the board's decision reflects that great efforts were made to accommodate plaintiff. Extensions of time were repeatedly granted, totaling in the end about a year and a half, for a job that was supposed to take 90 days. In short, plaintiff has not shown why the board's findings on this issue should be overturned and they will stand. Plaintiff's default was not excusable.

■ Plaintiff next claims that the default termination was improper because the termination notice had several formal defects which violated procurement regulations. *See* 41 C.F.R. §§ 1–1.318–1(a), 1–18.-803–4, –5 (1979). For instance, the notice did not have the proper contract number and date; it did not state that the Government reserved all its rights and remedies; it did not state that the notice constituted a decision pursuant to the disputes clause; and it was not signed by the contracting officer. However, at the time the notice was sent, plaintiff was not performing under the contract and had not been performing for some time. The board found that plaintiff was not misled by the notice and that all essential information was conveyed by the notice. Plaintiff apparently was also able to make a timely appeal of the contracting officer's decision and the appeal was tried on the merits before the VACAB. Furthermore, plaintiff does not claim that it was harmed in any way by the admitted defects of the notice. We hold, therefore, that such defects give plaintiff no cause to complain here. We do not favor sloppy practices nor approve of violations of the

---

**3.** The findings are: (1) another firm wanted $131,000 for the job (plaintiff claims it was $150,000); (2) defendant's engineer retained his $88,000 estimate for the work (plaintiff claims

he raised it); (3) plaintiff's initial sub–subcontractor did not have a representative at a preconstruction conference (plaintiff claims it did).

procurement regulations, but in the instant case no harm has come thereby. To nullify this termination for default solely on the grounds of these harmless technical defects would be to grant plaintiff an entirely unwarranted windfall. A case such as *Bostwick–Batterson Co. v. United States*, 151 Ct.Cl. 560, 283 F.2d 956 (1960), is not to the contrary. There the contractor received an insufficient notice of a final decision and thus did not appeal the decision within 30 days, whereupon the appeals board dismissed the appeal as untimely. The court reversed, holding the notice insufficient under the contract and regulations to constitute a final decision. 151 Ct.Cl. at 565, 283 F.2d at 958–59. It is precisely the lack of any harm to plaintiff in this case which distinguishes it from the *Bostwick* case.

■ Plaintiff's last two arguments may be considered together. The third argument is that the contracting officer had no authority to terminate the contract for default. The fourth argument is that since the contracting officer had no such authority there was no valid termination and therefore no proper dispute over which the board could acquire jurisdiction. Hence, both arguments turn on the contracting officer's authority.

Plaintiff's argument regarding the contracting officer's authority turns on the above–quoted contract provision which provides that the default clause, among others, shall be invoked in appropriate cases when requested by the contracting officer but if the SBA disagrees with the request the matter is to be referred for resolution. Plaintiff interprets this to mean that only the SBA could terminate for default or that the VA could, but only after agreement by the SBA. Since the SBA refused to agree to the default termination, plaintiff continues, the VA contracting officer had no authority under the contract to default plaintiff.

The first flaw in plaintiff's logic is that there is no finding by the board that the SBA did disagree with the default termination. Indeed, the above–described conversations between Mr. Odom, the contracting officer, and Mr. Monteleone, the SBA representative, would seem to indicate there was express agreement, but the board made no specific finding to that effect.

However, the board did make the following relevant findings of fact, not excepted to by plaintiff: (1) the SBA did not intend to, nor did it establish the administrative organization for invoking the default clause itself; (2) the VA and SBA operated informally without any formal procedure for effectuating a default termination; (3) the determination to default plaintiff was made only after PRB was irretrievably in default and unable to proceed with the work; (4) the parties, VA and SBA, acted with full intercommunication; (5) the VA officially sent copies of all documents relating to the termination to SBA and Mr. Monteleone was informed of the impending default termination by telephone; in short, the SBA was fully notified of the VA's intent to terminate and of the termination. We think that under these circumstances, the SBA's failure to ever exercise its contractual right to disagree (if indeed it ever wished to), and have the matter referred for resolution, amounted to implicit agreement to the default termination. We need not and do not reach the question of whether the SBA's failure to disagree will in all cases authorize a default termination by another procuring agency under a clause such as the one above–quoted. We only hold that under the circumstances of this case SBA's inaction was properly treated by the VA as an implied agreement.

Finally, we reject plaintiff's contention that only the SBA could terminate PRB for default. There is nothing in the contract language to require that. Given the board's finding that SBA established no administrative organization for invoking the default clause and given that the VA was administering the subcontract, we think it permissible for the VA to issue the termination notice.

We therefore hold that defendant satisfied the contract terms and that the VA contracting officer had authority in this instance to terminate plaintiff for default.

It follows that there was a proper dispute between the parties and the board acquired jurisdiction over plaintiff's appeal. The board's decision is correct in law and fact and is affirmed. The defendant's motion for summary judgment is granted and plaintiff's motion for summary judgment is denied. The petition is dismissed.