**STATE OF FLORIDA, DEPARTMENT OF INSURANCE, as Receiver for Southeastern Casualty & Indemnity Insurance Company, Plaintiff–Appellant,**

v.

**The UNITED STATES, Defendant– Appellee.**

**No. 95–5106.**

United States Court of Appeals, Federal Circuit.

April 10, 1996.

---

Jack Rephan, Hofheimer, Nusbaum, McPhaul & Samuels, P.C., Norfolk, Virginia, argued, for plaintiff-appellant.

Mitchell J. Matorin, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., argued, for defendant-appellee. With him on the brief were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, and Sandra P. Spooner, Deputy Director. Of counsel was Alice Covington, United States Postal Service, Washington, D.C.

Before RICH, LOURIE, and BRYSON, Circuit Judges.

BRYSON, Circuit Judge.

The construction contract at issue in this case resulted in a default termination of both the contractor and the contractor's surety. The surety's receiver sued the United States for damages based on losses suffered by the surety in connection with the project. The Court of Federal Claims denied relief, *Florida Dep't of Ins. v. United States*, 33 Fed. Cl. 188 (1995), and we affirm.

I

In October 1987, the Padula Construction Company (Padula) contracted with the Postal Service to build a post office facility in Jupiter, Florida. Padula failed to perform according to the contract requirements, and on October 18, 1988, shortly before the completion date set forth in the contract, the Postal Service terminated the contract for default. The Postal Service provided notice of the default to Padula's surety, the Southeastern Casualty and Indemnity Insurance Company (Southeastern). Pursuant to its performance bond agreement, Southeastern undertook to finish the building, promising to use its best efforts to complete the work in accordance with the terms of the original contract. At the time it took over the project, Southeastern promised that within two weeks it would provide a written strategy for finishing the work.

Southeastern did not meet that deadline. In fact, for several months Southeastern did little or no work on the project. In early November 1988, the Postal Service complained to Southeastern about its failure to prepare a project schedule and emphasized that "in order to meet the needs of the Postal Service for the facility and to minimize the expense for Southeastern Casualty Company due to contractual penalties for late delivery of the building, it is essential that everything possible be done in order to expedite the completion of the facility." In early December, the Postal Service warned Southeastern of continuing damage to the structure resulting from exposure to the elements because the roof of the building had not yet been completed. The Postal Service reiterated its concern about the project schedule and again advised Southeastern that it planned to pursue liquidated damages under the contract for the delay in completing the building. At the same meeting, the Postal Service questioned Southeastern's desire to go to bid on the project and again demanded a project schedule. On December 20, 1988, the Postal Service wrote Southeastern to state that it was "increasingly concerned about the lack of response" from Southeastern regarding the plans for completing the facility. The Postal Service requested a full written report on the status of the matter within 10 days, and it restated its concern "that any further delay will accelerate the deterioration of the existing construction work." By the end of December, Southeastern had neither provided the Postal Service with a project schedule nor advanced the project's completion.

In February 1989, Southeastern informed the Postal Service that it had chosen Frank Maio General Contractors, Inc. (Maio) to complete the project. Maio provided a proposed work schedule that estimated the project would be completed by August 1989.

**1096**

The parties did not fix a firm date for completion of the building, but the Postal Service again advised Southeastern that liquidated damages continued to accrue and would be deducted from any monthly payment requests. To ensure that the project would move forward within a reasonable time, the Postal Service again requested updated schedules and documentation regarding the identity of the proposed participants and their roles in completing the project. Southeastern did not comply with that request.

A March 1989 site inspection showed that no work was in progress inside the building and that the roof was still incomplete. On March 30, the Postal Service told Southeastern that it was critical that arrangements be made immediately to complete the roof.

In early April, the Postal Service learned that the Treasury Department would likely revoke Southeastern's authority to act as a federal bond surety because Southeastern had failed to meet the Department's minimum financial requirements to retain that status. The Postal Service asked to meet with Southeastern on April 18 to discuss a possible termination for default because of Southeastern's failure to make progress on the project. During the April 18 meeting, a Postal Service representative asked for a specific commitment from Southeastern that it was ready, willing, and able to complete the project without delay. In response, Southeastern stated that it had no obligation to keep the Postal Service advised of its progress. After the Postal Service again warned Southeastern that termination was imminent, Southeastern stated it should not be required to "isolate, analyze and submit corrective proposals at [its] expense" for defective work performed by Padula. Southeastern also suggested that, because of the necessary corrective work, the building might not be completed in August as Maio had promised.

On May 12, 1989, the Postal Service terminated Southeastern for default because of its failure to make progress. The Treasury Department revoked Southeastern's certificate of authority to act as a federal surety on the same day. In August 1989, a Florida court deemed Southeastern insolvent and appointed a receiver.

In December 1990, the Florida Department of Insurance, as receiver for Southeastern, submitted a claim to the contracting officer for $465,973.65. Of that amount, $200,000 was attributable to the Postal Service's allegedly improper progress payments to Padula prior to Padula's default, and the remainder was attributable to funds expended by Southeastern after it took over the project. After the contracting officer denied the claim, Southeastern's receiver filed suit in the Court of Federal Claims for the amount set forth in the claim. The court granted partial summary judgment to the United States with respect to the payments to Padula; after trial, the court ruled in favor of the United States on the remaining portions of the claim.

II

A

The appellant first argues that the Postal Service waived its right to terminate Southeastern, because it failed to set a deadline for completion after the original October 1988 deadline had passed and because it allowed Southeastern to continue to perform until May 1989. By those actions, the appellant maintains, the Postal Service led Southeastern to believe that time was no longer of the essence and induced Southeastern to undertake substantial efforts to complete the contract.

A waiver of the government's right to terminate a contract for default may be found when the government allows "a delinquent contractor to continue [substantial] performance past a due date," under circumstances that justify a conclusion that the default has been excused. *DeVito v. United States,* 413 F.2d at 1147, 1153–54 (Ct.Cl. 1969). The purpose of the waiver doctrine is to protect contractors who are led to believe that time is no longer of the essence and undertake substantial efforts after the performance date specified in the contract has passed. *Olson Plumbing & Heating Co. v. United States,* 221 Ct.Cl. 197, 602 F.2d 950, 955 (1979). When the non-breaching party

waives a deadline, it must set a new deadline for performance so that the parties will understand when performance is required. *Id.*

■ The trial court found the waiver doctrine inapplicable in this case, and we agree. As the court found, the Postal Service did not permit a deadline to pass or indicate forbearance with respect to the time requirements in the contract. The Postal Service terminated Padula for default and reminded Southeastern that liquidated damages stemming from Padula's default continued to accrue. At the meeting with Southeastern following Padula's termination, the Postal Service made clear that the existing contract provisions had not been altered and must be adhered to.

The Postal Service subsequently made numerous efforts to spur Southeastern to action: it repeatedly expressed dismay regarding the construction problems at the site; it put Southeastern on notice that it contemplated terminating Southeastern because of its failure to make progress on the project; and it sought assurances that Southeastern would promptly complete the project. After Maio took over the work in February, the Postal Service continued to emphasize that it needed the building completed as soon as possible and to advise Southeastern that the condition of the project was deteriorating because the roof was incomplete. Thus, Southeastern could not reasonably have believed that time was not of the essence or that its previous periods of delay had been excused.

■ We also disagree with the appellant's contention that it was improper for the Postal Service to terminate Southeastern's right to proceed in May 1989 for failure to make progress. It is true that, after months of inactivity, Southeastern took some steps towards completing the contract during the period between February and May of 1989. The trial court, however, found that all of Southeastern's efforts between October 1988 and May 1989 advanced the project by no more than 10 percent. The court also found that when the Postal Service sought information in late April about the status of the project, Southeastern replied that it had no obligation to keep the Postal Service informed of its progress and that there would probably be further slippage in the completion date for the project. Under those circumstances, together with the surety's dubious financial status as of May 1988, the Postal Service was "justifiably insecure about the contract's timely completion." *Discount Co. v. United States,* 213 Ct.Cl. 567, 554 F.2d 435, 441 (1977). We therefore agree with the trial court that the Postal Service acted within its rights in terminating Southeastern's right to proceed.

### B

The appellant argues that the Postal Service violated a duty to Southeastern by paying Padula for defective work and by misrepresenting to Southeastern that Padula's work was satisfactory. Because of the Postal Service's improper administration of the contract, the appellant argues, Southeastern should not have been held responsible for its delay in completing the contract or its failure to correct the deficiencies in Padula's work. Although the parties argue at length about the nature and source of the government's duties to a performance bond surety under a government construction contract, *see generally United States Fidelity & Guar. Co. v. United States,* 230 Ct.Cl. 355, 676 F.2d 622 (1982), we find it unnecessary to reach that legal issue, because the factual premises underlying the appellant's arguments are flawed.

■ First, the appellant provides no support for its assertion that the Postal Service acted improvidently in making progress payments to Padula because the quality of Padula's work was so defective that the payments should have been withheld or Padula terminated for default. The evidence before the trial court was that although there were problems with Padula's performance, Padula was making progress on the building until about September 1988, when Padula apparently stopped paying its subcontrators and conditions at the project began to deteriorate rapidly. The Postal Service stopped the progress payments to Padula at that time and initiated the process that led to Padula's termination. The appellant does not provide

any basis for concluding that the Postal Service violated a duty to Southeastern by making progress payments to Padula before September 1988.

■ Second, there is no evidentiary support for the appellant's assertion that the Postal Service misrepresented the quality or extent of Padula's work during the time Padula was on the job. In response to Southeastern's periodic inquiries regarding Padula's work, the Postal Service reported that there were problems with the work and that the project was somewhat behind schedule. When Padula's performance fell off in September 1988, the Postal Service warned Southeastern that Padula was experiencing significant difficulties and that the condition of the project was "deteriorating." Pursuant to Southeastern's request, the Postal Service agreed to withhold Padula's September 2, 1988, progress payment as well as any subsequent payment requests. Accordingly, there is no factual support for the appellant's arguments that Southeastern is entitled to relief because of Postal Service misrepresentations about Padula's performance, or that Southeastern's failure to complete the project promptly after taking over the work in October 1988 should be excused because of Postal Service malfeasance in administering the contract with Padula.

### C

■ The appellant argues that Southeastern's termination for default must be converted into a termination for the convenience of the government because the termination notice failed to advise Southeastern of its appeal rights. *See* 41 U.S.C. § 605(a). The trial court held that the omission of any reference in the termination notice to the contractor's appeal rights violated the Contract Disputes Act, but that on the facts of this case the violation was harmless. *See Philadelphia Regent Builders v. United States,* 225 Ct.Cl. 234, 634 F.2d 569, 573 (1980) ("To nullify this termination for default solely on the ground of these harmless technical defects would grant plaintiff an entirely unwarranted windfall."); *see also Decker & Co. v. West,* 76 F.3d 1573, 1579 (1996) ("harm should accompany a defect in an oth-

erwise proper termination notice in order for the contractor to seek relief based on that defect"); *Sea–Land Service, Inc. v. United States,* 735 F.Supp. 1059, 1063 (C.I.T. 1990) (relief may be granted based on omission of statutorily required notification of right to sue only if party was prejudiced by the absence of the notification), *aff'd and adopted,* 923 F.2d 838 (Fed.Cir.1991).

We agree with the trial court that the absence of notification of appeal rights in the termination notice was harmless error, for several reasons. Southeastern had actual notice of its appeal rights at the time it received the termination letter, because those rights were explicitly set forth both in the termination notice to Padula, which was read by Southeastern's representative, and in the original bonded contract. Moreover, the appellant's only allegation of prejudice on appeal is that the defective notice caused Southeastern to lose its right to appeal to the Board of Contract Appeals following the termination. The appellant, however, challenged the Postal Service's actions by appealing from the denial of its 1990 payment request. The contracting officer's letter denying that claim clearly spelled out the appellant's right to appeal either to the Postal Service Board of Contract Appeals or to the Court of Federal Claims.

The appellant has not pointed to any possible injury that it may have suffered as a result of appealing from the denial of its payment request, rather than from the termination notice. As the appellant acknowledges, it has been able to challenge the default termination in the course of this litigation, and it made an informed choice to litigate this case in the Court of Federal Claims rather than before the Board of Contract Appeals. We therefore agree with the trial court that the appellant has failed to make a plausible claim of prejudice stemming from the defect in the termination notice.

Contrary to the appellant's assertions, *Kisco Co. v. United States,* 221 Ct.Cl. 806, 610 F.2d 742 (1979), does not require that the default termination be converted into a termination for the convenience for the government. In *Kisco,* the relevant termination

notice not only failed to advise the contractor of its appeal rights, but also failed to comply with the contractual cure period and "was so internally confusing" that the contractor may not have understood that the notice constituted a final decision. *Id.* at 752. Here, by contrast, the termination notice simply omitted a statement of the contractor's rights of appeal, which had been referred to in other materials previously provided to the contractor. The trial court properly held that, under the circumstances of this case, that procedural defect does not justify overturning an otherwise valid termination for default.

*AFFIRMED.*