RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2000 FED App. 0268P (6th Cir.)
File Name:  00a0268p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

DIVERSIFIED ENERGY, INC.,
       *Plaintiff-Appellant/*
       *Cross-Appellee,*

     *v.*

TENNESSEE VALLEY
AUTHORITY,
       *Defendant-Appellee/*
       *Cross-Appellant.*

Nos. 98-5857/5935

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 97-00223—Thomas G. Hull, District Judge.

Argued:  August 13, 1999

Decided and Filed:  August 10, 2000

Before:  KEITH, BOGGS, and CLAY, Circuit Judges.

————————————

## COUNSEL

**ARGUED:**  Herbert S. Sanger, Jr., WAGNER, MYERS &
SANGER, Knoxville, Tennessee, for Appellant.  Peter K.
Shea, TENNESSEE VALLEY AUTHORITY, Knoxville,
Tennessee, for Appellee. **ON BRIEF:** Herbert S. Sanger, Jr.,

Charles W. Van Beke, WAGNER, MYERS & SANGER, Knoxville, Tennessee, for Appellant.    Peter K. Shea, Edwin W. Small, James E. Fox, TENNESSEE VALLEY AUTHORITY, Knoxville, Tennessee, for Appellee.

CLAY, J., delivered the opinion of the court, in which KEITH, J., joined.  BOGGS, J. (pp. 21-26), delivered a separate dissenting opinion.

─────────────

**OPINION**

─────────────

CLAY, Circuit Judge.  Plaintiff, Diversified Energy, Inc. ("Diversified"), filed this breach of contract action against Defendant, Tennessee Valley Authority ("TVA"), pursuant to the Contract Disputes Act of 1978 ("CDA"), 41 U.S.C. §§ 601-13, alleging that TVA had improperly refused to accept deliveries and make payments under a long-term coal supply contract between the parties.  The district court granted summary judgment in part to Diversified, but refused to award damages on grounds that Diversified's own material breaches precluded any monetary recovery.  Diversified has appealed from the court's refusal to issue a damage award.  TVA, in turn, has filed a cross-appeal objecting to the district court's initial partial grant of summary judgment to Diversified.  For the reasons set forth below, the district court's order is **AFFIRMED** in part, **REVERSED** in part, and the case **REMANDED** to the district court with instructions to make a damages determination in accordance with standard contract law principles.

**I.**

**A.**

Diversified is a Tennessee corporation that produces and sells coal.  On August 18, 1990, Diversified and TVA entered into a long-term coal supply contract (the "Contract"), providing that Diversified was to supply TVA with 10,000

substantive interests from the alleged variations from the proper chain of command. Diversified's "sandbagging" approach to these defects should constitute a waiver of any technical procedural objection that it may have.

It may be that the court's opinion will serve as a good lesson to bureaucrats that the failure to send a specific type of routine letter to parties who are already adequately informed of changes in the administrative hierarchy can cost millions of dollars. Unfortunately, the "benefits" of that lesson will not be visited on the bureaucrats themselves but on the taxpayers and rate payers involved. I believe that the cases cited by the court do not support this result, and I therefore respectfully dissent.

tons of coal per week through March 27, 1996 (except that the first fourteen weeks would be at a rate of 6,000 tons). The Contract was signed by James Hardy, Purchasing Agent for TVA, and by Randy Edgemon, Diversified's President. The following five provisions are of particular significance on appeal:

### *"Reopener" provision*

The *Term* section of the Contract contained a "reopener" provision that provided the parties an option to reopen the Contract at its mid-way point "for the purpose of negotiating price and other terms and conditions of the remaining portion of the maximum commitment." (J.A. at 18.) The section read in relevant part:

> *Term*. [T]his contract shall continue through March 27, 1996, unless terminated by agreement or as otherwise negotiated herein. Provided, however, this contract may be reopened by either party three (3) months prior to March 19, 1993 . . . for the purpose of negotiating price and other terms and conditions of the remaining portion of the maximum commitment. . . . If either party exercises this reopener it shall give the other party written notice by December 19, 1992. If the reopener provision has been exercised, this contract will terminate on March 19, 1993, unless TVA and the Contractor have mutually agreed in writing by March 19, 1993, to continue this contract. Neither party shall be under any obligation or liability to extend this contract if either party desires to terminate deliveries.

(J.A. at 18.)

### *"Contracting Officer" Provision*

The Contract was made pursuant to the CDA, which statutorily provides express dispute resolution procedures for all claims "relating to" certain types of contracts entered into by an executive agency such as TVA. Under the CDA, only the individual identified as the official "Contracting Officer"

is authorized to act on behalf of the government.  The statute reads:

> [T]he term "contracting officer" means any person who, by appointment in accordance with applicable regulations, has the *authority to enter into and administer contracts and make determinations and findings with respect thereto.*  The term also includes the authorized representative of the contracting officer, acting within the limits of his authority.

41 U.S.C. § 601(3) (emphasis supplied).  TVA's published regulations implementing the CDA further identify the Contracting Officer as the TVA's duly authorized representative under the agreement.  The applicable regulation also provides that a designation of "Contracting Officer" may only be changed by written notice:

> The term "Contracting Officer" means TVA's Director of Purchasing, or duly authorized representative acting within the limits of the representative's authority.  The TVA Purchasing Agent who administers a contract for TVA is designated as the duly authorized representative of the Director of Purchasing to act as Contracting Officer for all purposes in the administration of the contract (including, without limitation, decision of claims under the disputes clause).  Such a designation continues until it is revoked or modified by written notice to the Contractor and the Purchasing Agent from TVA's Director of Purchasing.

18 C.F.R. § 1308.2(e)

In light of these statutory and regulatory provisions, the Contract set forth a requirement, applicable to both Diversified and TVA alike, as to the person authorized to administer the Contract.  TVA's Purchasing Agent was designated as the agency's Contracting Officer:

> *Contracting Officer.*  The Contracting Officer shall be the Manager of Purchasing, TVA, or his/her duly

President for Purchasing, he was at the top of the contracting hierarchy and was directly authorized to serve as Contracting Officer to bring the complaint about Diversified's actions that breached the contract.

None of the cases cited by the court in section II B, *supra* at 16-17, involve a situation where a claim was held invalid simply for failure of signature or approval by one administrative official rather than another.  Indeed, it would be surprising if there were such cases, involving matters fully and properly litigated, where the only alleged defect is in the technical propriety of the initiation of a proceeding.  In the much more serious matter of criminal liability, it has been repeatedly held that similar defects in commencing a criminal proceeding are to be disregarded if the matter has been otherwise fairly tried.  See, *e.g., Hobby v. United States,* 468 U.S. 339, 345 (1984) (citing *Frisbie v. United States*, 157 U.S. 160, 163-65 (1895)) (foreman's failure to sign grand jury indictment not necessarily fatal to the indictment);*United States v. Wright*, 365 F.2d 135 (7th Cir. 1966) (indictment sufficient though signed by an assistant, rather than United States Attorney); *Wiltsey v. United States*, 222 F.2d 600 (4th Cir. 1955) (indictment sufficient though not actually signed by anyone).  See generally 1 *Charles A. Wright*, Federal Practice & Procedure, § 103, p. 314 and § 123, p. 537 (3d ed. 1999).

Numerous cases attest that substantial compliance with administrative requirements is generally sufficient, and that "magic words" are not required.  See *State of Florida, Department of Insurance v. United States*, 81 F.3d 1093, 1098 (Fed. Cir. 1996) (citing and quoting cases, especially *Philadelphia Regent Builders v. United States*, 634 F.2d 569, 573 (Ct. Cl. 1980)) ("To nullify this termination for default solely on the ground of these harmless technical defects would grant plaintiff an entirely unwarranted windfall").  Thus, even prior to King's actions, the successive persons who replaced Hardy and dealt with Diversified did not lose all ability to act on behalf of TVA as Contracting Officer.  Diversified has not even alleged any plausible harm to its

This is despite the fact that Diversified continued to deal with TVA through a succession of other employees (first Ronald Martin, then Marion Duncan, then Gregory Nicely, according to Diversified) and never complained that it was in any doubt as to the person with whom it should deal, nor expressed any hesitance as to the authority of the person with whom it was dealing.

The only complaint came with respect to the letter sent by Mr. Vincent purporting to terminate the contract. Diversified objected to his authority to speak for TVA, and to the possibility of one of his subordinates adjudicating the dispute as Disputes Contracting Officer. This objection was rectified following the order by Judge Jarvis on April 22, 1993. Diversified was informed by Mr. King, the TVA Director of Purchasing, that he would now be acting as the Disputes Contracting Officer, responsive to Diversified's complaint about having a subordinate of Vincent be the Disputes Contracting Officer. See JA 235; slip op. at 10. He also informed Diversified of TVA's position that Diversified had breached the contract by giving benefits. Diversified again never complained about the nature of the notice, nor as to the person who gave notice, nor as to King being the Disputes Contracting Officer. The issue was fully litigated on the merits in the administrative proceeding, without further difficulty.

In short, Diversified's position, now accepted by this court, is that it was free to laugh up its sleeve during all of the administrative proceedings over the contract dispute. If it prevailed in those proceedings, well and good. If it did not, it knew, in this court's opinion, that it was free to disregard any adverse action, simply because TVA failed to send a perfunctory letter over the previous year. To me this is neither sound policy nor sound administrative law.

Whatever was the case prior to June 25, 1993, King's actions in appointing himself as the Disputes Contracting Officer and exercising his power as Contracting Officer at that point cured any possible earlier difficulties. As Vice

authorized representative. The Manager of Purchasing has designated the Purchasing Agent who administers this contract for TVA as his/her duly authorized representative to act as the Contracting Officer for all purposes in the administration of the contract except for the purpose of deciding a dispute, such designation to continue until revoked or modified by the Manager of Purchasing. Should the need arise, the Manager of Purchasing shall designate a Disputes Contracting Officer for the purpose of deciding any dispute as provided in Section 26, *Disputes*.

(J.A. at 43.)

### Disputes Provision

The Contract contained a *Disputes* clause expressly subjecting the Contract to the CDA and to TVA's implementing regulations. By statute, the Contracting Officer plays a pivotal role if any dispute arises between the government and the contractor: "All claims by the government against a contractor relating to a contract shall be the subject of a decision by the contracting officer." 41 U.S.C. § 605(a). Towards this end, the applicable TVA regulation promulgated under the CDA provides: "When TVA believes it is due relief under a contract, the Contracting Officer shall make a request for relief against the Contractor, and shall attempt to resolve the request by agreement." 18 C.F.R. § 1308.14.

Similarly, the contractor must submit its claim against the government to the Contracting Officer. 41 U.S.C. § 605(a); 18 C.F.R. § 1308.11. If the parties are unable to mutually resolve their differences, then the Contracting Officer is statutorily empowered to unilaterally issue a decision on the disputed matter. 41 U.S.C. § 605(a). The contractor may then appeal to an agency board of appeals or to federal court. 41 U.S.C. § 609(a).

Pursuant to these statutory and regulatory provisions, the *Disputes* section provided that any dispute that the parties

cannot settle themselves "shall be decided by the Disputes Contracting Officer (who may be the purchasing agent administering this contract)." (J.A. at 50.) The Contract directed that "[a]ny claim by the Contractor shall be submitted in accordance with the [CDA] and TVA's implementing regulations." (J.A. at 50.) Finally, the Contract provided that in lieu of an appeal to the TVA Board of appeals from the decision of the Disputes Contracting Officer, the contractor may bring an action against TVA directly in federal district court.

### *"Officials not to Benefit" Provision*

The Contract also contained an *Officials not to Benefit* provision that, among other things, prohibited Diversified from giving anything of monetary value to a TVA agent or employee, except as permitted by federal regulations.[1] This provision read in relevant part:

> [N]or shall the Contractor offer or give, directly or indirectly, to any officer, employee, special Government employee, or agent of TVA any gift, gratuity, favor, entertainment, loan, or any other thing of monetary value, except as provided in 18 C.F.R. § 1300.735-12 or -34. Breach of this provision shall constitute a material breach of this contract and TVA shall have the right to exercise all remedies provided in this contract or at law.

(J.A. at 49.)

### *"Unilateral Termination Right" provision*

In the *Unilateral Termination Right* provision, TVA expressly reserved the right, upon sixty days' notice to Diversified, to unilaterally terminate the Contract. As a penalty for invoking this clause, TVA promised to pay

---

[1] Federal regulations create an exception for gifts or loans made in the context of "an obvious family or personal relationship." 18 C.F.R. § 1300.735-12(b)(1).

. . . "contracting officer" means "any person who . . . has the authority to enter into and administer contracts . . . includ[ing] the authorized representative of the contracting officer . . . ."

41 U.S.C. § 601(3).

In TVA, "contracting officer" means the "Director of Purchasing, or duly authorized representative"; specifically, the "Purchasing Agent who administers a contract . . . ." 18 C.F.R. § 1308.2(e).

This contract contained essentially the same provision. JA 43.

Diversified's case rests on the alleged failure by TVA to have the proper Contracting Officer bring the claims against Diversified. However, Diversified never complained, until this appeal, about this alleged breach. Even more, Diversified was fully aware of the claimed defects, and not only did not raise them, but affirmatively proceeded as though the procedures were valid.

With respect to the raising of TVA's claim of breach, it is true that Diversified objected to the claimed termination of the contract on this basis by Mr. *Vincent's* letter of March 19, 1993. However, once that letter had been set aside, and Mr. *King*, the Manager of Purchasing, appointed himself as Disputes Contracting Officer, Diversified made no further objection throughout the course of the proceedings to the consideration of that claim. Indeed, that was the whole purpose of the proceedings. King had informed Diversified of TVA's claim in his original letter of June 25, 1993 appointing himself. Diversified can hardly be heard to say now that it is entitled to set at nought the entire proceeding in which it cheerfully participated, on the ground that it knew all along that a technical defect had occurred.

Stripped to its essence, Diversified's claim is that TVA could never have acted with respect to this contract, once Mr. Hardy left, without having had a new delegation letter issued.

3.    There is a clearly stated consequence of mere exercise: "If the reopener provision has been *exercised*, this contract will terminate" unless there is an agreement in writing to continue; and

4.    The paragraph concludes with the quite strong and explicit summary that "[n]either party shall be under any obligation or liability to extend this contract if either party desires to terminate deliveries."

Thus, I believe that a careful reading of the language of the contract shows that TVA was permitted to terminate the contract at will under this provision. In addition, even a fair interpretation of the term "negotiating . . . other terms and conditions" would cover refusing to continue a contract that the other party has been breaching. What kind of "term and condition" could be inserted to ensure compliance with the exact term that has previously been violated? We would be requiring an act of utter futility to insist that TVA sit down with Diversified and simply repeat:  "We can't trust you, you've cheated before."

Diversified also contends that even if the analysis above were to be correct, TVA may not invoke its protection because it did not properly invoke the terms of the contract by having the proper official give the notice of reopening. As I explain below, this alleged error in no way disadvantaged Diversified, Diversified did not raise it at any time prior to this appeal, and there is no indication that the provision was meant to limit the government's options under the circumstances. Further, a careful parsing of the "chain of command" in TVA indicates that there was no breach of the contract's provisions, and any argument that there was a breach of the regulations or statute is quite tenuous.

### IDENTITY OF THE CONTRACTING OFFICER

The court is correct that the Contract Disputes Act specifics how disputes are to be settled, and who can speak for a government agency.  The chain of authority is:

Diversified "an amount equal to $14.00 per ton, multiplied by the remaining number of tons scheduled for delivery from the effective termination date herein through the earliest applicable date for termination, pursuant to the reopening provisions under Section 2, *Term*." (J.A. at 51-52.)

### B.

At the commencement of the Contract in 1990, the Contracting Officer for all purposes in the administration of the Contract (expect for the purpose of deciding a dispute) was TVA's purchasing agent, James Hardy.  On June 16, 1992, Hardy wrote to Edgemon advising him that he was changing jobs and that the new administrator of the Contract would be announced shortly.  However, the record reflects that TVA at no time informed Diversified -- in writing or otherwise -- precisely who had been designated to replace Hardy as the Contracting Officer, despite TVA's statutory and contractual obligations to do so. Nonetheless, Diversified subsequently   received a coal quality adjustment report, signed by Ronald L. Martin, Purchasing Agent.  According to the affidavit of Richard Rea, Manager of the Fuel Acquisition and Supply organization in TVA's Fossil and Hydro Power Group, Martin was the new Contracting Officer authorized to act on behalf of TVA until a reorganization of duties removed him from that position sometime in November of 1992.

Rea attests that Marion Duncan was assigned to replace Martin in November of 1992.  However, the record does not indicate that this was announced to Diversified or that Duncan was ever the "Purchasing Agent" within the meaning of the Contract.  In any event, on December 14, 1992, Duncan, signing his letter as "Manager, Fuel Acquisition -- Illinois Basin," exercised the Contract's "reopener" provision. Edgemon responded to Duncan's letter with several letters and phone calls attempting to open negotiations before the March 19, 1993, expiration date.  However, TVA did not respond to any of Edgemon's attempts to negotiate price or terms and conditions under the reopener position.

During this same period, TVA was investigating the circumstances surrounding some loans Edgemon had made to a TVA employee, Daniel Bradshaw, in apparent violation of the *Officials not to Benefit* clause. Bradshaw was a transportation specialist in TVA's Fuel Supply organization and had access to confidential and commercially valuable information on coal contracts. TVA suspected that Edgemon gave money and college football tickets to Bradshaw in exchange for confidential information.[2]

TVA's concern about the possibility of unethical or illegal conduct both by Bradshaw and Edgemon was behind its refusal to negotiate new terms under the reopener provision. On March 19, 1993, the date the Contract was set to expire if the parties had failed to mutually agree upon new terms, Gregory Vincent, TVA's Vice-President of Fossil Fuels, wrote to Edgemon regarding the Contract and three other coal supply contracts between the parties. It is undisputed that Vincent was *not* the Contracting Officer authorized to act for all purposes in the administration of the Contract. His letter stated that Edgemon's financial transactions with Bradshaw violated the *Officials not to Benefit* provisions of the four contracts between Diversified and TVA, including the Contract at issue on appeal. Because of the breaches, the letter further notified Diversified that TVA would not extend any of those contracts; and that, to the extent they had not otherwise expired, these contracts were terminated.

Diversified responded to this letter by filing suit in federal district court, seeking to enjoin TVA from terminating one of the other contracts discussed in the letter. On April 22, 1993,

---

[2]Diversified does not dispute that Edgemon made several loans of money to Bradshaw, but claims that these loans did not constitute a material breach of the Contract under the *Officials not to Benefit* clause because they qualified for the close personal relationship exception. A criminal prosecution of both Edgemon and Bradshaw ended in an acquittal on all counts not already dismissed by the district court. *See United States v. Edgemon, Bradshaw and Hill*, No. 3-95-CR-43 (E.D. Tenn.).

_____

### DISSENT

_____

BOGGS, Circuit Judge, dissenting. TVA had a long-term coal contract with a supplier, Diversified, who was engaged in providing benefits to a TVA officer in violation of the contract. TVA thought it should, within the bounds of legality, not do business with such a supplier. Instead, it now finds itself in the position of paying potentially millions of dollars to the malefactor. Because I believe this result is not compelled by law, I dissent.

TVA basically raises two reasons that it should prevail: (1) The terms of the contract caused the contract to terminate automatically in 1993 under certain circumstances; and (2) Diversified breached the contract's terms by providing favors to TVA employees engaged in the administration of the contract. I agree fully with the first argument, and believe that the second has merit as well.

### TERM OF THE CONTRACT

In my view, the relevant provision, quoted by the court at page 3, taken as a whole, clearly allowed either party to walk away from the contract in 1993 if it so desired. The only language possibly favorable to Diversified's position is the statement that "this contract may be reopened by either party . . . for the purpose of negotiating price and other terms and conditions . . . ." However:

1. There is no other reference in the "*Term*" paragraph to this "purpose" language and no indication of any method for judging the purpose of an announced reopening;

2. The operational language in the paragraph is purely volitional: "[I]f either party *exercises* this reopener it shall give . . . notice" (emphasis added);

Finally, we reject TVA's claim that interpreting the Contract to require negotiation after exercise of the reopener would render a nullity the language providing that neither party was required to extend the Contract if that party desired to terminate deliveries. Requiring that the parties pursue negotiations is not the same as requiring the parties to agree. The language on which TVA relies merely provided that, if the parties could not agree on renegotiated terms after reopening the Contract, they need not continue with the business relationship. Read in conjunction with the "negotiation" text, then, this language still has significant meaning and effect because it made clear that the parties were not obligated to extend the contract if they could not agree on new terms following negotiations. This interpretation is preferable to the one set forth by TVA because it has the effect of harmonizing the disputed provisions, rather than rendering one of them without meaning. *See International Union, UAW v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983) (stating that a contract should be construed in a manner that harmonizes the entire instrument).

Accordingly, we find TVA's cross-appeal to be without merit.

## V.

For the foregoing reasons, the district court's order is **AFFIRMED** in part, **REVERSED** in part, and the case **REMANDED** to the district court with instructions to make a damages determination in accordance with standard contract law principles.

the district court issued the requested injunction, and expressly stated: "[TVA] shall not rely upon the March 19, 1993, Letter as the basis of any claim or termination under the contracts listed therein . . . in this or any other proceeding." (J.A. at 119.) The court reasoned that before TVA could act on the basis of a claim such as the one asserted in Vincent's letter, it must follow the dispute resolution procedures set forth in the Contract's *Disputes* clause.

Although arguably enjoined from relying on Vincent's termination letter for any purpose, TVA refused to accept any deliveries of coal under the Contract after March 19, 1993.

### C.

By letter dated May 18, 1993, Diversified exercised its own rights under the Contract's *Disputes* clause and initiated a dispute alleging that TVA had either (i) breached the Contract by failing to negotiate under the reopener provision or (ii) had invoked its right to unilaterally terminate the Contract under the *Unilateral Termination Right* clause, and therefore owed Diversified $14 per ton on the remaining undelivered 1,570,000 tons of coal. Diversified also stated that, since a decision to terminate the Contract had been made by Vincent, a superior of the Contracting Officer, the Contracting Officer would not be free to make an independent determination of the question and should not be designated the Disputes Contracting Officer.

In response to Diversified's last concern, Victor King, TVA's Vice President of Purchasing, designated himself as the Disputes Contracting Officer to resolve Diversified's claim. After allowing time for negotiation, and after allowing each party to present its arguments, he issued a decision finding that Diversified had violated the Contract's *Officials not to Benefit* clause and that TVA was justified in refusing to accept further coal deliveries. King's letter read in pertinent part:

The *Term* provision of the Contract indicates that, after TVA reopened the Contract, unless TVA and the

Contractor mutually agree in writing by March 19, 1993, the Contract would terminate. It further states that "neither party shall be under any obligation or liability to extend this Contract if either party desires to terminate deliveries." I conclude that TVA had the right under the Contract to terminate the Contract by declining the extension during the reopener period and did so.

Based on various financial transactions between Mr. Edgemon and TVA's former employee, Mr. Danny Bradshaw, there appears to have been violations by Diversified of the *Officials Not to Benefit* clause in the Contract. I find that TVA was also justified in not accepting further deliveries after March 19, 1993, because of these violations.

I find that there is no evidence that TVA terminated the Contract under Section 27, *Unilateral Termination Right.*

(J.A. at 133.)

**D.**

Diversified then filed this suit in district court appealing the Disputes Contracting Officer's decision and seeking damages in the amount of $21,980,000 -- the total price of the undelivered coal following TVA's premature termination of the Contract. On Diversified's subsequent motion for summary judgment, the court found that both parties had committed material breaches of the Contract. The court first found that Diversified had breached the *Officials not to Benefit* clause twice: (i) in 1991, when Edgemon loaned TVA employee Bradshaw $1,900; and (ii) again in 1992, when Edgemon loaned Bradshaw an additional $1,300. The district court expressly found that these were material breaches of the Contract that would have allowed TVA to invoke the CDA pursuant to the Contract's *Disputes* provision and seek to terminate future dealings with Diversified.

However, the court concluded that TVA had not properly exercised its rights under the *Disputes* provision upon

negotiate after reopening the Contract constituted a breach of the "reopener" provision, so that the Contract did not expire of its own terms on March 19, 1993. In its cross-appeal, TVA argues that this ruling ignores the text at the conclusion of the "reopener" provision: "Neither party shall be under any obligation or liability to extend this contract if either party desires to terminate deliveries." (J.A. at 18.) TVA contends that this language made clear that neither party was obligated to negotiate once the Contract had been reopened. We disagree.

We believe that the text upon which TVA relies, when viewed in conjunction with the provision's earlier language that the Contract "may be reopened . . . *for the purpose of negotiating price and other terms and conditions*," at best merely created an ambiguity as to the negotiation question. It is well-settled that courts are to construe ambiguities against the drafter of a contract, which in this case was the TVA. *See Hills Materials Co. v. Rice*, 982 F.2d 514, 516-17 (Fed. Cir. 1992) (construing an ambiguous contract clause against the government where the government had drafted the contract).

Moreover, TVA's interpretation would render this earlier language meaningless. "Under settled principles of construction, this contract must be read as a whole so as to give meaning and effect to all of its provisions." *Malone & Hyde, Inc. v. United States*, 568 F.2d 474, 476 (6th Cir. 1978). The stated purpose of the "reopener" provision was to allow the parties to renegotiate price and other terms and conditions. The parties' inclusion of this language clearly indicates that they intended the reopener provision to be exercised for the express and limited purpose of negotiating new terms, if possible. *See, e.g., Robich v. Patent Button Co.*, 417 F.2d 890, 892 (6th Cir. 1969) (stating that contracts terms should be given their plain meaning). Had the parties intended to allow the Contract to be reopened for any reason -- not simply to permit renegotiation as specified -- then they could have omitted this limiting language.

This theory is inapplicable where, as here, it would not serve to limit the government's damage exposure, but would have the directly opposite effect of multiplying the amount of damages TVA would owe for its breaches. Indeed, the record reflects that Diversified's anticipated profits under the Contract was at most $.98 per ton of coal, less expenses -- a small fraction of $14 per ton in damages Diversified would be awarded under the *Unilateral Termination Right* clause. Accordingly, there is no basis for converting TVA's contractual breaches into a constructive invocation of its unilateral termination right under the Contract. While, as set forth above, we believe that the district court erred in refusing to award Diversified any monetary relief as a result of TVA's multiple breaches, the damages determination should be made in accordance with standard contract law principles.

## IV.

We now turn to TVA's cross-appeal. TVA objects to the district court's holding that it had breached the Contract by failing to negotiate with Diversified after exercising the Contract's "reopener" provision. TVA argued before the court below that the Contract had been properly reopened and then expired by its own terms on March 19, 1993, after the parties had failed to reach a mutual agreement pursuant to this provision. TVA contended that because the Contract had already expired of its own terms, TVA's ensuing conduct -- such as its refusal to accept or pay for any further coal deliveries -- did not constitute breach, and, therefore, Diversified was not entitled to summary judgment.

The district court rejected this argument. As set forth in Part I, *supra*, the "reopener" provision permitted either party to reopen the Contract at its mid-way point "for the purpose of negotiating price and other terms and conditions of the remaining portion of the maximum commitment." (J.A. at 18.) The court concluded that, given this contractual language, once TVA reopened the Contract, it was obligated to make some good faith attempt to renegotiate its terms and conditions. The court thus held that TVA's refusal to

discovering Diversified's misconduct. Instead, the court found that TVA had breached the Contract on four separate occasions as a result of what the court termed its "inept and heavy-handed behavior." (J.A. at 161.) The district court found:

(i)   That TVA had breached the *Contracting Officer* provision by having an unauthorized person (Duncan) exercise the Contract's reopener provision, even though this breach was of no legal significance because Diversified had failed to raise it before the Disputes Contracting Officer;

(ii)  That TVA had breached the *Term* provision by refusing to negotiate terms and conditions with Diversified after the Contract had been reopened;

(iii) That TVA had again breached the *Contracting Officer* provision by having someone other than the Contracting Officer write the March 19, 1993, letter terminating the Contract and refusing all future coal deliveries; and

(iv)  That TVA had breached the *Disputes* provision by attempting to terminate the Contract on the basis of Edgemon's improper loans by issuing the March 19, 1993, letter rather than by following the established statutory and contractual procedures.

The court thus held that the Contract did not expire on March 19, 1993, pursuant to the reopener provision, and that TVA had breached the Contract by attempting to terminate it without following the procedures mandated both by the Contract and by the CDA.[3] Accordingly, the court granted Diversified's motion for summary judgment in part, but

---

[3] The court, however, rejected Diversified's argument that TVA's conduct should be interpreted as a constructive invocation of the "Unilateral Termination Right," provision, which would have obligated TVA to pay almost $22 million in damages.

refused to award any monetary relief: "Although it is the plaintiff which has moved for summary judgment, and although the Court has found TVA guilty of many breaches of the terms of its contract, it does not find the plaintiff entitled to any damages. In this Court's judgment, Diversified's prior breaches of the contract disqualify it from the damages it would otherwise recover." (J.A. at 161-62.)

Diversified subsequently filed a motion to alter or amend the judgment, which urged the court to strike its findings that Diversified had violated the *Officials not to Benefit* clause and thereby materially breached the Contract. Diversified argued that this issue was not properly raised before the Disputes Contracting Officer, and, therefore, the administrative decision below deciding the issue against Diversified was invalid and could not form the basis of further action in federal court. The district court nonetheless refused to award any damages on equitable grounds.

This appeal and cross-appeal followed. On appeal, Diversified argues (i) that the issue of Diversified's breach of the *Officials not to Benefit* clause was not properly before the district court, and, therefore, provided an impermissible basis for the court to refuse Diversified's damages request; and (ii) that Diversified was entitled to damages under the Contract's *Unilateral Termination Right* provision because TVA's multiple breaches should be construed as a "constructive invocation" of that clause. In its cross-appeal, TVA contends that the district court improperly held that TVA had breached the Contract by failing to negotiate with Diversified after exercising the Contract's reopener provision.

## II.

Diversified's primary contention on appeal  is that the district court erred in refusing  to award the company any monetary relief despite finding TVA guilty of multiple breaches. As set forth above, the district court rested its decision on equitable grounds, reasoning that Diversified's own prior breaches of the *Officials not to Benefit* clause should disqualify the company from reaping the benefits of a

permissible basis for its refusal to award Diversified any monetary relief for the damages it incurred as a result of TVA's multiple contract breaches.

## III.

Diversified next argues that its damages award should be governed by the Contract's *Unilateral Termination Right* provision, which allowed TVA to unilaterally terminate the Contract upon sixty days' notice to Diversified, but imposed a stiff penalty upon TVA for doing so: payment of $14.00 per ton for each ton scheduled for delivery under the remainder of the Contract -- in this case, an amount totaling $21,980,000. On appeal, Diversified urges this Court to treat TVA's multiple breaches -- particularly its refusal to accept any further deliveries and its failure to negotiate after exercising the reopener provision -- as a constructive invocation of the Contract's unilateral termination clause. We decline to do so. The district court properly held that TVA did not "constructively invoke" the Contracts's *Unilateral Termination Rights* clause so as to assume the financial obligations set forth therein.

Although courts have, in their discretion, converted the government's contract breach or default into a unilateral termination on the basis of a "constructive" invocation of a clause permitting voluntary termination by the government, this is done only in order to *limit* the government's damage exposure. "[T]he rule has been established that if the contract contains a termination for convenience clause and the contracting officer could have invoked the clause instead of terminating, rescinding or repudiating the contract on some other invalid basis, the court will constructively invoke the clause to retroactively justify the government's actions, avoid breach, and *limit* liability." *Best Foam Fabricators, Inc. v. United States*, 38 Fed. Cl. 627, 638 (Ct. Cl. 1997) (emphasis supplied) (stating that "[t]his rule has been applied in . . . cases to limit a contractor's recovery"); *id*. at 637-38 (citing cases and statutory authority).

We therefore reject TVA's contention that any technical defect in its compliance with the Contract was merely harmless error that did not preclude the district court from considering its claim with respect to the *Officials not to Benefit* clause. *See, e.g., State of Fla., Dep't of Ins. v. United States*, 81 F.3d 1093, 1098 (Fed. Cir. 1996) (holding that, despite the CDA's requirements to the contrary, the government's failure to provide a notice of appeal rights in a Contracting Officer's decision terminating a contract was harmless error, given that there had been actual notice and no significant prejudice to the appellant). TVA's failure to submit a valid claim to the Disputes Contracting Officer cannot be dismissed as a mere "technical defect." It is undisputed that a valid claim is a jurisdictional prerequisite to federal court review. Without it, neither the Disputes Contracting Officer nor the district court had the authority to consider TVA's arguments on this issue. The cases TVA cites are distinguishable because, unlike here, the procedural defects did not implicate the validity of the claim or of the Disputes Contracting Officer's final disposition of the administrative proceedings -- the two jurisdictional prerequisites to federal judicial review.

## C.

In sum, for the district court to have exercised jurisdiction under the CDA, there must have been both a valid claim and a valid final decision by the Disputes Contracting Officer resolving that claim. With respect to the *Officials not to Benefit* clause issue, it appears that TVA did not bring a valid claim in the administrative proceedings below because Diversified's alleged breaches were raised by someone other than the contracting officer who lacked the contractual authority to do so. Without a valid claim, the Contracting Disputes Officer was not authorized to resolve this issue, and, therefore, his decision purporting to do so is also invalid. In the absence of both a valid claim and a valid final decision below, the district court lacked jurisdiction over TVA's claim that Diversified breached the *Officials not to Benefit* clause. Accordingly, we conclude that the district court lacked a

damages award. On appeal, however, Diversified argues that the issue of its breach of the *Officials not to Benefit* clause was not properly before the district court, and, therefore, provided an impermissible basis for the court to refuse Diversified's damages request. Specifically, Diversified contends that the district court was precluded from making this determination because TVA's Contracting Officer had never brought a valid claim against Diversified for breach of this clause as provided for in the CDA and the Contract's *Disputes* provision. We agree. TVA's failure to follow the mandated statutory and contractual procedures deprived the district court of jurisdiction to consider Diversified's alleged breach of the *Officials not to Benefit* clause.

## A.

In invoking Diversified's alleged breach as justification for its own conduct with regard to the Contract, TVA was obliged to comply with the procedures set forth in the Contract itself and with the regulations promulgated under the CDA. Both authorities required that TVA's claim with respect to the *Officials not to Benefit* clause be raised by the Contracting Officer -- the only official with the contractual and regulatory authority to act on TVA's behalf in the administration of the Contract. As noted, the Contract expressly stated that the Contracting Officer was the "duly authorized representative . . . [to act] for all purposes in the administration of this contract except for the purpose of deciding a dispute." (J.A. at 43.) Moreover, the applicable TVA regulation provides that "[w]hen TVA believes it is due relief under a contract, the Contracting Officer shall make a request for relief against the Contractor." 18 C.F.R. § 1308.14.

However, the record reflects that the Contracting Officer at no time initiated a claim arising out of Diversified's alleged breach of the *Officials not to Benefit* clause. Gregory Vincent, TVA's Vice-President of Fossil Fuels -- who was undisputedly *not* the Contracting Officer -- authored the March 19, 1993, letter that purported to terminate the parties' business relations as a result of Diversified's alleged breach.

Nor does it appear that the Contracting Officer was the one who raised the *Officials not to Benefit* issue on TVA's behalf as an affirmative defense to Diversified's subsequent allegations of breach before the Disputes Contracting Officer. As the district court stated in its order denying Diversified's motion to alter or amend the judgment: "The Court agrees that TVA's contracting officer did not bring a claim under the *Officials not to Benefit* clause and that Diversified's alleged breaches of this clause were raised, administratively, as an affirmative defense by someone other than the contracting officer who lacked the contractual authority to do so."[4] (J.A. at 165.)

TVA's claim with respect to the *Officials not to Benefit* clause was thus invalid under the Contract because it was not initiated by the appropriate official -- the Contracting Officer -- and, therefore, was not properly asserted in the course of the administrative proceedings. Still, the court below proceeded to consider Diversified's alleged breaches in determining that the company was not entitled to any monetary relief. The district court continued:

> Nevertheless, rightly or wrongly, these breaches were considered by the Disputes Contracting Officer and they were central to his decision to deny Diversified any relief. The Court cannot ignore the information in the administrative record and is unwilling to reach what it considers to be an inequitable result in this action. In this Court's judgment, Diversified's prior breaches of the

---

[4] We find unpersuasive TVA's argument that it fully complied with the Contract and the applicable regulations because the Disputes Contracting Officer who decided the *Officials not to Benefit* clause issue was simultaneously serving as the Contracting Officer authorized to raise this claim. The Contract made clear the Contracting Officer was authorized to administer the Contract "*except for the purpose of deciding a dispute.*" (J.A. at 142; emphasis supplied). Although Victor King, TVA's Vice President of Purchasing, appointed himself as the Disputes Contracting Officer to resolve the parties' dispute, the record nowhere reflects that he was also designated as the Contracting Officer pursuant to the *Contracting Officer* provision.

contract disqualify it from the damages it might otherwise have been entitled to recover.

(J.A. at 165.)

## B.

We believe that the district court erred in considering Diversified's alleged breaches of the *Officials not to Benefit* clause even after finding that the Contracting Officer did not properly initiate a claim with respect to this issue in the administrative proceedings below. "[F]or the court to have jurisdiction under the CDA, there must be both a valid claim . . . and a contracting officer's final decision on that claim." *James M. Ellett Constr. Co. v. United States*, 93 F.3d 1537, 1541-42 (Fed. Cir. 1996). Because TVA's claim with respect to the *Officials not to Benefit* clause was not raised by the official with contractual authority to do so, it was not properly before the Disputes Contracting Officer. As a result, the Disputes Contracting Officer was not empowered to issue a final decision resolving this claim, and his decision purporting to do so was invalid. "A contracting officer's final decision is invalid when the contracting officer lacked authority to issue it." *Case, Inc. v. United States*, 88 F.3d 1004, 1009 (Fed. Cir. 1996).

It is well-settled that an invalid contracting officer's decision may not serve as the jurisdictional basis for a CDA action in federal court. *See United States v. Grumman Aerospace Corp.*, 927 F.2d 757, 579 (Fed. Cir. 1991); *see also J&E Salvage Co. v. United States*, 37 Fed. Cl. 256 (Ct. Cl. 1997) (holding that federal court lacked jurisdiction over contract dispute where the contractor failed to submit a valid claim to the contracting officer, thereby rendering the contracting officer's purported final decision invalid). The district court thus lacked jurisdiction over TVA's claim that Diversified breached the *Officials not to Benefit* clause, and so could not deny Diversified's damages request on that basis. Whatever the district court's subjective misgivings or equitable concerns, it lacked the authority to rule on or consider an issue beyond its jurisdiction.